## JIM HARRIS *v.* STATE.

### Opinion delivered May 31, 1915.

1. HOMICIDE—FIRST DEGREE MURDER.—In the absence of premeditation and deliberation, a killing can not be murder in the first degree, and the burden is on the State to establish the specific intent.

2. HOMICIDE—FIRST DEGREE MURDER—PROOF—PREMEDITATION.—To warrant a conviction of first degree murder, the evidence must show that the killing with malice was preceded by a clearly formed design to kill, a clear intent to take life; the design to kill may, however, be the conception of a moment, and reason being upon its throne, it is only necessary that the premeditated intention to kill should have actually existed as a cause determinately fixed on before the act of killing was done, and was not brought about by provocation received at the time of the act, or so recently before as not to afford time for reflection.

3. HOMICIDE—FIRST DEGREE MURDER—INSUFFICIENCY OF THE EVIDENCE—PRESERVING PEACE IN HOME.—It appeared from the evidence that defendant had invited deceased to his house to a dinner and a dance, and that prior thereto there was no ill feeling between the two men; at the dance deceased created some disturbance. *Held,* defendant had the right to preserve the peace and to enforce order in his own home, and that under the evidence, when defendant killed deceased in the furtherance of that purpose, and as the result of a sudden quarrel, that it will be held as a matter of law that defendant was not guilty of first degree murder.

4. HOMICIDE—MURDER—CONVICTION FOR TOO HIGH A DEGREE.—While the facts show that defendant killed deceased with a deadly weapon, and under circumstances from which the law will imply malice, he can not be convicted of first degree murder, where the act was not done after deliberation and premeditation essential to constitute murder in the first degree; and where defendant has been so convicted of first degree murder, the judgment will be reversed and the cause remanded, unless the Attorney General will elect to have defendant sentenced for murder in the second degree.

5. HOMICIDE—CONVICTION—REVERSAL—SENTENCE FOR LESSER CRIME.—When the evidence is not sufficient to sustain a verdict for murder

in the first degree, but is sufficient to sustain a verdict for murder in the second degree, the cause, instead of being reversed, and remanded for a new trial, may, with the consent of the Attorney General, be remanded with directions to sentence for murder in the second degree.

Appeal from Lafayette Circuit Court; *George R. Haynie,* Judge; reversed.

### STATEMENT BY THE COURT.

The facts are substantially as follows: The appellant is a negro. On the 10th of February, 1915, there was at his house what the witnesses designate in the record as a festival, to which the negroes in the neighborhood were invited, and where they had a supper and dance. Along about 2 or 3 o'clock in the morning, as the witnesses say, there was a "considerable fuss in the house."

One of the witnesses for the State, describing it, says: "Mr. Johnnie (referring to John Daniels, the deceased), said, 'This is Uncle Johnnie Daniels talking; now come and let's dance.' A woman told him not to call her name. He replied he was not scared of her. Jim Harris (appellant) was standing in the middle of the door, and met the woman. He had his pistol in his hand and commenced to shoot and shot five times. Daniels fell in the floor. He had nothing in his hand."

Another witness stated that Daniels came to the festival late in the night, and there was a big crowd in the house.

Another describes the fuss as follows: "There was a squabble among some girls. John Daniels (the deceased) stepped on a girl's foot, and told her to go ahead. She started toward Harris, who met her half-way. Harris come up to Daniels and commenced to talk. He cussed and shoved and shot him."

Another witness stated that John Daniels, "Spoke there to Mitchell Marlowe, and they were squabbling, and he said there wasn't no use in that. At that time Jimmie (Harris) walked over and says, 'John, what's the matter?' and Johnnie says, 'Nothing; I just told these fellers about there was no use squabbling,' and he (John Dan-

iels) says, 'Mr. Daniels is around here.' Jim Harris says, 'Yes, and Mr. Jimmie is around here,' and that time Jimmie said, 'John, you get out of here,' and Johnnie spoke and said, 'You give this festival and opened the doors for everybody to have a good time,' and Jimmie spoke up and says, 'You get out of here; don't there'll be hell and a whole lot of it,' and John spoke and said, 'Let it be hell and a whole lot of it,' and that time Jimmie commenced shooting. John Daniels, at the time of the shooting, had his right hand out and his left hand in his pocket.''

Another witness details the occurrence as follows: "Mr. Mitchell and Sue and Dude was in the corner. Mitchell and Sue was fussing, and Mr. John walked up and spoke to Mitchell about fussing with a little girl, and told him he ought to be ashamed to be fussing with her, and Mitchell talked about knocking her head off, and Mr. John told him he ought to be ashamed to be talking about knocking a little girl's head off, and that time Willie Taylor come over there in the corner, and what she said to Mr. Johnnie, I don't know, and he says, 'Go on, I am not talking to you,' and she went over to cousin Jimmie (Harris) and cousin Jimmie (Harris) come over there and says, 'What is the trouble?' and Mr. John (Daniels) says, 'Nothing,' and cousin Jimmie (Harris) says, 'Go on out, and Mr. John (Daniels) had his side to him and I just put my hand on his shoulder and told him to go on out; and cousin Jimmie (Harris) says, 'Go on out, hurry, go out, there'll be hell and plenty of it,' and Mr. Johnnie (Daniels) says, 'Let it be hell,' and that time he shot him.'' This witness, on cross-examination, stated that John Daniels asked him for a knife to open some whiskey with.

Another witness stated that "they danced two sets while I was there, and after that they all got up in the corner, and that was when the fuss commenced.'' This witness stated that he did not hear any cursing at all before the shooting commenced. He also stated that John Daniels told him after he was shot that Harris shot him for nothing.

Another witness stated, "I don't know how it started, but when I knowed anything they was over there in the corner squabbling, and I heard somebody say there was going to be shooting, to get out of here, there was going to be shooting, and I looked over there and they was standing up in the corner squabbling and cussing one another, and Mr. Jimmie shoved him and shot him twice, then stepped back about three steps and shot him three times more. I didn't see John (the deceased) with nothing."

Witnesses for the State testified that they did not see any pistol, and that John Daniels, the deceased, did not have a pistol.

The testimony by the appellant and several witnesses in his behalf tended to show that he gave a supper and dance to the negroes on the night of the fatal rencounter, and that the deceased, John Daniels, just before he was killed, was creating a disturbance in the house, and that the appellant protested, asked him to desist and to get out of the house, whereupon he refused and attempted to shoot appellant, and thereupon appellant fired upon him and killed him.

Several of the witnesses stated that John Daniels was cursing and that Harris told him that if he wanted to fight anybody to go out in the road and fight it out, that he didn't want any fighting done in his house. A witness stated that John Daniels was cursing, and exclaimed that he was "the baddest son-of-a-bitch in the house." This witness also stated that he heard John say he "would kill him, God damn him."

One of appellant's witnesses described what took place as follows: "He (John Daniels) was walking around there in the house cussing among them before they commenced fussing. He was dancing before he commenced fussing. After he quit dancing he commenced walking around the house cussing, with a pistol in his hand. When I saw him he was walking around there in the floor with his pistol in his hand kinder down to his side, and when Mr. Jimmie Harris went to ask him to

stop cussing, and if he wanted to fight to go out doors, John spoke and said he was a God damned man; couldn't nobody make him do nothing, and he throwed his hand toward Mr. Jimmie Harris and Mr. Jimmie knocked his hand back and commenced shooting.''

Appellant testified in his own behalf that deceased and a whole crowd of people came to the supper and dance. ''About an hour after they started to dancing, two women got to scrapping around there, and I told them to hush, or they would have to get out of the house, and the women hushed and went on dancing; and they come to the bar and commenced drinking, and about fifteen or twenty minutes afterward they all got over in the corner, and John Daniels commenced cursing over there, and I went over there and asked him what the matter was, and he said 'God damn it, they have been raising hell all night,' and he was the baddest man in the house, and he was going to do some fighting, and I says, 'No, John, don't fight; I give this supper for the people to have a good time,' and I told him if he wanted to fight to go outdoors, and when I told him that he run right out of the corner with a pistol in his hand, and it scared me, and I commenced backing away from him and jerked my pistol out so he could see it; thought maybe that would keep him off of me, and he commenced cursing me, and says, 'God damn you, I will kill you before I get out of here; and he commenced coming up on me, and I shoved him back, and he come up on me again and grabbed me, and I shoved him back and commenced shooting. I was scared he was going to shoot me, and I shot him to keep him from shooting me.''

The court gave instructions on the law concerning the different degrees of homicide and self-defense. No objection is urged to any instruction except No. 10, given at the instance of the State, which is as follows:

''10. If you believe from the evidence in this case that the defendant, armed with a deadly weapon, sought the deceased with a felonious intent to kill him, or sought or brought on, or voluntarily entered into the difficulty with the deceased with the felonious intent to take his

life, then the defendant can not invoke the law of self-defense, no matter how imminent the peril in which he found himself placed.''

The jury returned a verdict finding appellant guilty of murder in the first degree, and from the judgment of the court sentencing him to be electrocuted he prosecutes this appeal.

*Allen H. Hamiter,* for appellant.

1. The facts and circumstances testified to by the witnesses did not justify the giving of instruction 10. They show that appellant, as host to the persons invited to his house, was acting, not in an unfriendly manner toward the deceased, but in accordance with his rights and his duty toward his guests in trying to preserve the peace. No malice, deliberation or premeditation is shown, and this instruction excluded appellant's plea of self-defense. 73 Ark. 399.

2. The evidence does not sustain a conviction either of murder in the first degree or murder in the second degree, because it is not sufficient to show premeditation, nor deliberation nor malice aforethought. Wharton on Homicide, 167; 118 N. C. 1145; 24 S. E. 722; 11 Ark. 455; 56 Ark. 8; 35 Ark. 585; 20 Ark. 250; 38 Ark. 221; 3 Kan. 450; 6 Neb. 136; 71 Mo. 218; 20 Tex. 522; 1 Tex. 159; 40 Ark. 511; Anderson's Dict. 334; Black's Dict. 348; 2 Bouvier Dict. 363-4.

3. Where the evidence is not sufficient to sustain a conviction for the degree of murder found by the jury, this court has often exercised the right to reverse and remand the case for new trial, or, at the election of the State, with directions to enter judgment for a lesser degree of murder. That principle ought to apply here. 69 Ark. 189; 21 L. R. A. (N. S.) 20, and note; 82 Ark. 97; 56 Ark. 8, 19; 70 Ark. 272; 29 Ark. 248; 76 Ark. 615; 73 Ark. 315; 34 S. W. 262.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. Instruction 10 was free of the argumentative feature condemned by this court in the *Price* case, 114 Ark.

398, and with that feature eliminated it was a proper instruction in this case, under the evidence. We believe the evidence is ample to sustain a finding by the jury that appellant voluntarily sought out the deceased for the purpose of bringing on the difficulty.

2.   There was premeditation, deliberation and malice aforethought shown, and the verdict is sustained by the evidence.   79 Ark. 460; 98 Ark. 120; 100 Ark. 330.

WOOD, J., (after stating the facts).   Giving the evidence its strongest probative force in favor of the finding of the jury, it is still not sufficient to sustain the verdict for murder in the first degree.   The burden of proof was on the State.

(1)   There is no testimony tending to show that prior to the shooting the appellant harbored any malice or ill will toward John Daniels.   The fact that John Daniels was at the home of the appellant, enjoying the hospitality which he had provided for his guests in the way of a dance and supper, or "festival," as the witnesses designate it, would warrant the inference that, up to the time when the dispute between them arose, the appellant and Daniels were friends.   If the contrary was true, the burden was on the State to prove it, and it has not done so.

(2)   Now, in the absence of premeditation and deliberation, the killing can not be murder in the first degree.   Kirby's Digest, section 1766.

As early as *Bivens* v. *State,* 11 Ark. 455, 460 and 461, this court, through Mr. Justice Scott, speaking of the character of proof necessary to establish murder in the first degree, said:

"It is indispensable that the proof adduced shall be sufficient to satisfy the minds of the jury that the actual death of the party slain was the ultimate result sought by the concurring will, deliberation, malice and premeditation of the party accused.   The distinctive feature of this particular class of cases of murder in the first degree being a wilful, deliberate, malicious and premeditated specific intention to take life.   The inquiry then in cases of this class of murder in the first degree, must always be, was the killing wilful, deliberate, malicious and deter-

mined on before the act of killing. If it was, then that degree of malice has superinduced the act that is necessary to make it rank in the highest grade of murder.

It is indispensable then in such cases that the evidence should show that the killing with malice was preceded by a clearly formed design to kill—a clear intent to take life. It is not, however, indispensable that this premeditated design to kill should have existed in the mind of the slayer for any particular length of time before the killing. Premeditation has no definite legal limits, and therefore if the design to kill was but the conception of a moment, but was the result of deliberation and premeditation, reason being upon its throne, that is altogether sufficient, and it is only necessary that the premeditated intention to kill should have actually existed as a cause determinately fixed on before the act of killing was done, and was not brought about by provocation received at the time of the act, or so recently before as not to afford time for reflection.''

That these are essentials and must be proved in order to convict of the crime of murder in the first degree has since then repeatedly been held by this court, and there has been no change in the doctrine. See cases collated under note "K," page 523, Kirby's Digest. See, also, *Green* v. *State,* 51 Ark. 189; *Cannon* v. *State,* 60 Ark. 564; *King* v. *State,* 68 Ark. 572-75; *Howard* v. *State,* 82 Ark. 97, 101; *Ferguson* v. *State,* 92 Ark. 120-124; *Gilchrist* v. *State,* 100 Ark. 330-37.

(3)   Applying the above doctrine to the facts of this record, the uncontroverted evidence shows that the killing of Daniels by the appellant was the result of a provocation, growing out of what the witnesses describe as a "squabbling" in the house of appellant, and in which appellant thought that Daniels was engaged. The witnesses for the State show that appellant approached Daniels, and those of them who purport to relate all that took place, state that appellant asked Daniels "What is the matter?" or "What is the trouble?" and asked him to go out of the house, but Daniels refused to go, and used brag-

gadocio in bandying words with appellant, showing that he did not intend to leave the room or to desist from his conduct, which appellant conceived was causing the disturbance.

A majority of us have concluded that under these circumstances the killing could not have been murder in the first degree, according to the essential ingredients of that crime as defined by our statute and the many decisions of this court.

True, appellant, by providing the dance and supper to which he had invited his guests, had in a measure thus thrown open the doors of his home to the public. Nevertheless, appellant was still the head of his house, the master of his home, and, as such, was the conservator of the peace and quiet of that home. He had the right, and it was his duty, under the circumstances, toward those whom he had invited there, to see that good order was preserved; and he had a right to request and to demand of those who were engaged in the quarrel or disturbance to desist and to go out of his house, and, upon refusal, to use such force as might be necessary to enforce his demands.

As before stated, there was no evidence of any bad blood between appellant and Daniels before the fatal rencounter. There was no evidence of any malice, threats or any previously formed design upon the part of the appellant before that time to do Daniels any harm. In the opinion of the majority, the killing was the result of the sudden quarrel, brought on in an effort by the appellant to preserve the peace of his home on the occasion of the "festival," and to remove Daniels, whose conduct had become objectionable to appellant, from the room.

(4) True, the provocation was not sufficient to justify the extreme measures to which appellant resorted, and it was not sufficient to reduce the killing from murder to manslaughter; but it was sufficient to reduce the homicide from murder in the first degree to that of second degree. Appellant acted hastily and in reckless disregard of human life. While there was no considerable provoca-

tion, and same was not apparently sufficient to arouse the passion of appellant and to make it irresistible, nevertheless there was some provocation. The uncontradicted proof shows that the killing was done with a deadly weapon, and under circumstances from which the law would imply malice, but it was not done after that deliberation and premeditation essential to constitute murder in the first degree. See *Howard* v. *State,* 82 Ark. 97.

As before expressed, the undisputed evidence, as we view it, shows that the killing was not the result of any previously formed design to kill, growing out of any grudge or ill will on the part of appellant toward Daniels; but was the result of the sudden quarrel or "squabble," and there was an entire absence of such deliberation and premeditation as must be proved before one can be convicted of murder in the first degree. As was said in *Harris* v. *State,* 36 Ark. 127-33:

"A doubt as to the degree of murder upon the facts of the case should be resolved upon a humane principle in favor of the accused."

(5) This court has repeatedly held that where the evidence is not sufficient to sustain a verdict for murder in the first degree, but is sufficient to sustain a verdict for murder in the second degree, the cause, instead of being reversed and remanded for a new trial, may, with the consent of the Attorney General, be remanded with directions to sentence for murder in the second degree. *Simpson* v. *State,* 56 Ark. 19-20; *Vance* v. *State,* 70 Ark. 272-86; *Darden* v. *State,* 73 Ark. 315-21; *Id.* 80, Ark. 295-299; *Howard* v. *State, supra; Pittman* v. *State,* 84 Ark. 292; *Warren* v. *State,* 88 Ark. 322-24.

The judgment will therefore be reversed and the cause remanded for a new trial, unless the Attorney General elects to have the appellant sentenced for murder in the second degree, in which event the trial court is directed to sentence appellant for that crime.