SIMMONS *v.* STATE.

4873                                    305 S. W. 2d 119

Opinion delivered July 1, 1957.

[Rehearing denied Sept. 30, 1957]

*Ovid T. Switzer* and *W. P. Switzer,* for appellant.

*Bruce Bennett,* Atty. Genl.; *Thorp Thomas* and *Clyde Calliotte,* Asst. Attys. Genl., for appellee.

PAUL WARD, Associate Justice. Appellant, a Negro man 63 years old, was convicted of murder in the first degree for the slaying of George Wells on the early morning of October 20, 1956. The deceased and another white man named Fred Watkins were discovered by appellant in a car with a Negro woman, Hattie Mae Williams, parked near the house where appellant and his family lived. Circumstances later developed left no doubt that the white men and the Negro woman were engaging in a prolonged orgy of drinking and immoral conduct.

When appellant approached the car one of the men called him a revolting name and when he started to return to his house he was again accosted by one of the white men. Thereupon the parties in the car drove away and appellant, so he says, thought they had left. Appellant then got his shotgun and started to hunt squirrels (he says) but in a short while he discovered the same

three people parked by the side of the road approximately one-half mile from appellant's home. There he saw one of the men and the Negro woman engaged in sexual intercourse. Appellant decided that he was going to call the law and returned to his home and got his automobile in order to drive to the nearest telephone. In going to the telephone it was necessary for him to pass along that portion of the road where he had last seen the people above mentioned. Finding the party car at or near where he had just previously left it, appellant drove by. As he proceeded along the road the other car forced him to stop. Again there was abusive and threatening language and appellant shot the deceased.

When shotgun shells picked up at the scene of the shooting were found to match appellant's shotgun he admitted to the sheriff that he had killed the deceased and also the other white man and the Negro woman. Later he signed a written confession which was introduced in evidence and is contained in the record. Appellant also took the witness stand in his own behalf. More than a half dozen witnesses some of whom had known appellant for a quarter of a century and among whom there were a school teacher, a groceryman, a contractor and a farmer, testified that he had a good reputation as being a quiet and peaceable citizen and "a good man in the community."

For a reversal or modification of the judgment of the trial court appellant makes one primary contention, and that is that there is no substantial testimony in the record to show that the slaying of George Wells by appellant was done with deliberation and premeditation. After a careful review of all of the testimony in the record and of the many decisions of this court relative to the point in issue we have concluded that appellant is right in his contention.

There is no testimony of any witness, aside from the testimony of appellant in open court and his written confession, from which the jury could have found the existence of premeditation and deliberation. Neither do we find any circumstance which amounts to substantial

evidence upon which a finding of premeditation and deliberation could be based. Consequently we are led to conclude that the jury must have resorted to speculation rather than substantial evidence in arriving at a verdict of murder in the first degree.

Appellant testified in substance: I live about three miles southwest of Crossett on the Sulphur Springs road. On the early morning of October 20, 1956 I heard a noise and saw a car parked on the road near my garden. When I was within 14 or 15 feet of the car a man jumped out and said: "Hey, where in the hell you going, you goddam son-of-a-bitch, don't come any farther. Go back." I was returning to my house when the man said "you son-of-a-bitch, you come out here," but I did not do so. There were three people in the car and I could tell one was a colored woman. When the car drove off in the direction of Crossett I thought they were gone. I had planned all night to go squirrel hunting and I had told Mr. Houston Childress I was going squirrel hunting. So I went into the house and got my shotgun and started out to where I had seen the squirrels' signs. Later on I saw the same car parked in the road again. One man was backed up against the hood of the car and the other man and the woman were behind the car on the ground in the act of intercourse. I saw them but I did not want to come in contact with them so I went around the car, into the thicket and then on up to my house, and I said to myself "I am going to call the law. Those folks are going to do something to me." **When I got** into my car and was coming down the road I found that their car was no longer where I had last seen it. However a little further down the road I heard their car and they were parked to where I could barely get by. Just as I "squeezed" by their car started up — I held the center of the road "and I seen they were driving past and I pulled over and they just whipped over right ahead of me and stopped." I pulled over to the left, and one man jumped out of the car — the driver — and got right in the road said "stop, stop, you goddam son-of-a-bitch. Where are you going?" I said, "I am going to call the law to you all." He said, "Yeah, you are going to call

the law goddam you, don't you know I am going to kill you?'' ''Nothing to do but protect my life. This other man said, 'kill the son-of-a-bitch, kill him.' He got up and I don't know whether it was a two-door or a four-door, and he came up and stuck his head over the front seat of the car and I shot them both.'' On cross examination appellant admitted to Sheriff Courson that he killed the deceased.

On November 5, appellant made and signed a written confession but it does not differ in any material way from his testimony as set forth above.

The testimony shows that the two white men and the Negro woman had with them in the car several cans of beer, some of which had been opened and some had not.

This court has on many occasions had the opportunity to consider the importance of the elements of premeditation and deliberation in connection with murder in the first degree. In the early case of *Burris* v. *State,* 38 Ark. 221, this court said: ''.  .  . , in order to convict the defendant of murder in the first degree, it is not sufficient to barely prove the killing. The State must also prove, beyond a reasonable doubt, that the killing was done willfully, deliberately, maliciously, and with premeditation of mind.'' It was said in *Simpson* v. *State,* 56 Ark. 8, 19 S. W. 99: ''An unlawful killing may be presumed murder, but it will not be presumed murder in the first degree. The burden of proving it so lies on the Commonwealth.'' The court in the case of *Ferguson* v. *State,* 92 Ark. 120, 122 S. W. 236, announced the rule this way:

''When the fact of death alone is proved, the presumption is that the crime is murder in the second degree; and, before it can be determined that the crime is murder in the first degree, it is incumbent on the prosecution to prove further, by evidence, that the killing was done with premeditation and deliberation. The premeditation cannot be inferred from the fact of death, but there must be evidence of a prior intention to do the act of killing in question.''

In the case of *Harris* v. *State,* 119 Ark. 85, 177 S. W. 421, the appellant was convicted of murder in the first degree and this court reduced it to murder in the second degree. Appellant, a Negro, was at a party or dance when trouble arose, a fight ensued and he killed one Johnny Daniels. This court in recognizing that premeditation was an indispensable element of murder in the first degree stated that it need not exist for any particular length of time, but that it must be shown to exist. The court also took into account the element of provocation, stating: "True, the provocation was not sufficient to justify the extreme measures to which appellant resorted, and it was not sufficient to reduce the killing from murder to manslaughter; but it was sufficient to reduce the homicide from murder in the first degree to that of second degree." Provocation to a considerable degree was present in the case under consideration.

This court in the case of *Stanley* v. *State,* 183 Ark. 1093, 40 S. W. 2d 415, again reduced a conviction for murder in the first degree to second degree, giving as the principal reason that "the killing appears to have been the result of a sudden affray or row provoked and brought on by the deceased in the serving of appellant with a bowl of chili that he had ordered." There was a conflict in the testimony regarding how the killing occurred but the court took the view that it was one continuous difficulty and altercation, provoked by the deceased. In the case under consideration we adopt the language which the court used in reaching its decision in the *Stanley* case, to-wit: "(We) have concluded that, under the circumstances and according to the undisputed testimony the killing could not have been murder in the first degree, and that the evidence is insufficient to support a conviction for a greater offense than murder in the second degree . . ."

In the case of *Blake* v. *State,* 186 Ark. 77, 52 S. W. 2d 644, the court considered the conviction of appellant for murder in the first degree and reduced it to murder in the second degree. Blake was a tenant on the farm of Brad Polk and a difficulty arose between them regarding an accounting. The testimony showed that there had

been a disagreement and there was also testimony that threats had been made. The killing was not disputed. The facts regarding the issue here considered are, we think, comparable to the case under consideration. In reducing the degree of the conviction; the court said: "We have concluded that, while this testimony is sufficient to support a verdict of murder in the second degree, it is not sufficient to support a verdict of murder in the first degree. We think there is lacking that deliberation and premeditation required to constitute the higher degree of murder."

We think the facts set forth in the case of *Porchia* v. *State,* 196 Ark. 1039, 120 S. W. 2d 700, are as favorable to sustain the verdict of murder in the first degree as they are in the case under consideration. The appellant, a Negro, was convicted of murder in the first degree for killing a white man. The evidence shows that the deceased had been drinking and that he overtook appellant as he was walking along the road. An altercation ensued in which the deceased knocked the appellant down and the appellant wounded him fatally with his knife. The court said that the only question to be determined was whether the act was premeditated and in holding that it was not this language was used: "While ordinarily malice is to be implied from the nature of a homicidal transaction and the circumstances attending its commission, yet in the instant case the state's testimony tends to show that premeditation and deliberation were absent." Again we think that the language there used in announcing its conclusion is applicable in the case under consideration. The court said: "It is our belief that the ends of justice insofar as penalties can satisfy or appease justice will be met by a sentence confining penalties can satisfy or appease justice will be met by a sentence confining appellant in the penitenriary for 21 years." Likewise the language used by this court in *Gulley* v. *State,* 201 Ark. 744, 146 S. W. 2d 706, is applicable in the case here considered, where it said: "We think the evidence falls short of showing beyond reasonable doubt that appellant went to James Williams' home with the intent of killing Louis White." Neither

can we say with confidence that appellant here had any intention of killing the deceased when he got in his car and started to inform the sheriff. In the case of *McClendon* v. *State,* 197 Ark. 1135, 126 S. W. 2d 928, we affirmed that it is necessary to ''show beyond a reasonable doubt that the killing was the result of malice,'' and then the court said: ''Certainly it does not show beyond a reasonable doubt that it was the result of deliberation and premeditation.'' In that case appellant had seized an ax and hit the deceased on the head causing his death. The court, in reducing his conviction of murder in the first degree to second degree apparently relied on the fact that the killing was the result of a difficulty that arose suddenly and continued until the fatal blow was struck, and that the appellant and the deceased, had theretofore been friends.

It is obvious that the line of demarcation in many cases, as in the case under consideration, between deliberation and the lack of deliberation is not easily discernible. It is a safe rule that deliberation must be proven, and beyond a reasonable doubt. In our opinion there is no direct testimony in this case to support the finding that appellant shot the deceased after deliberation and premeditation. Also there is no circumstance which is inconsistent with the direct proof. We are especially impressed by the fact that if appellant had wanted to or had intended to kill the deceased he would have done so when he encountered him the second time. Appellant had his shotgun at that time and he found the deceased in a relationship with the Negro woman which was calculated to infuriate him to the extreme. If appellant had wanted or intended to kill the deceased we can think of no better opportunity for him to have done so than he had at that time. The mere fact that he did not (but went home to get his car so he could drive to a telephone and call the sheriff) necessarily negatives the assumption that appellant got his shotgun, in the first instance, with premeditation and murder in his heart. If the jury concluded appellant was lying about going to call the sheriff, then such conclusion rested on mere conjecture because there is no testimony in the rec-

ord to sustain it. As we view the record there is no testimony or circumstance to show (and certainly not to show beyond a reasonable doubt) that premeditation and deliberation were present in the mind of appellant when he fired the fatal shot.

Since the evidence is sufficient to support a verdict for murder in the second degree, the judgment will be so modified and appellant's punishment fixed at 21 years in the penitentiary, and, as so modified, the judgment of the trial court is affirmed.

Justices McFADDIN, SMITH and ROBINSON dissent.

SAM ROBINSON, Associate Justice (dissenting). The evidence in this case proves that the defendant killed three people in deliberate, cold-blooded murder. He was tried for one of the murders; the jury found him guilty as charged, and fixed the penalty at life in the penitentiary. In all probability, the life sentence was given instead of death in the electric chair because of the immoral conduct of the three people that appellant shot to death with a repeating shotgun. The trial judge was of the opinion that the evidence was sufficient to send the case to the jury on the question of whether the defendant was guilty of murder in the first degree. Twelve jurors selected with the approval of the defendant, from among the residents of the county where the crime was committed, after seeing all of the witnesses including the defendant, and listening to the testimony, and considering the law as given to them by instructions of the court, unanimously agreed that the defendant was guilty of murder in the first degree. It is hard for me to see how the jury could arrive at any other verdict if they did what they swore they would do, and that was to try the case according to the law and evidence, and render a true verdict thereon.

In stating that there is no substantial evidence in the record to support the first degree murder verdict, the majority has apparently overlooked and failed to consider important evidence in the record. In fact, the majority does not mention any of the evidence favorable

to the State's case and which goes to prove murder in the first degree, although, in my opinion, the record is replete with such evidence. It appears from the majority opinion that the only evidence considered in setting aside the jury verdict is the testimony of the defendant. To say the least, such testimony can hardly be unbiased. Moreover, the defendant's own testimony proves him guilty of first degree murder. The majority stresses the fact that there is no direct evidence proving premeditation and deliberation, which are necessary elements of murder in the first degree. A murderer who kills his victim after premeditation and deliberation rarely commits such crime in the presence of witnesses. If the State must produce eye witnesses to such crimes in order to get a conviction, then law enforcement in this State, as to such crimes, is virtually impossible. All the murderer has to do is catch his victim alone, kill him, and then testify there was no premeditation and deliberation. In the case at bar, however, the defendant did not find his victim alone; there were eye witnesses, but the defendant surmounted that difficulty merely by killing the witnesses. He was tried in this case, not for killing his first victim, but for killing one of the witnesses to the first crime.

Now for a consideration of the evidence in detail: On the morning of the 20th day of October, 1956, at about 6:10, Bob Bush, while on his way to work on the Sulphur Springs road about 3 1/2 miles Southwest of Crossett, saw an automobile parked on its proper side of the road. The parking lights were burning on the parked car, and it was headed toward Crossett. As Bush approached the parked car he noticed a man lying in the road near the left door of the car. Bush slowed down, and as he passed the parked automobile he noticed what appeared to be two injured people in the car. He got out of his automobile and found that the man on the ground was badly injured, or dead. He had been shot with a shotgun. It developed that the man on the ground was wounded seriously, and he died a short time later. Sitting on the right side of the front seat of the two-door parked car was a woman who had been

killed by a shotgun blast to the left side of her head. Seated on the right side of the rear seat, directly behind the woman, was a man who had been killed by two blasts from a shotgun; one load of shot had struck him in the left side toward the back, and one load of shot had struck him in the back of the head. Officers were notified and, upon their arrival at the scene of the crime, they ascertained that the man on the ground was Fred Watkins, the dead woman on the front seat was Hattie Mae Williams, and the dead man on the rear seat was George Wells.

The defendant in this case, Frank Simmons, was tried for the murder of George Wells, who was the man sitting on the rear seat of the car where he was killed by being shot twice with a 16 gauge shotgun loaded with No. 6 shot; one load of shot struck him in the side and the other in the back of the head.

The defendant lived on the Sulphur Springs road, a little over one half mile from the scene of the crimes. In the course of the investigation the officers talked to him concerning the killings; he denied any knowledge of who might have committed the crimes, but admitted that he owned a 16 gauge shotgun, and had some shells loaded with No. 6 shot. The officers obtained the gun from the defendant and sent it, with other 16 gauge shotguns which they had located in the community, and empty shells found at the scene of the killing, to State Police headquarters at Little Rock to be examined by a ballistics expert in an effort to determine if the empty shells found at the scene of the crimes had been fired from any of the guns the officers had obtained. Upon an examination by an expert it was learned that the empty shells found at the scene of the killing had been fired by the gun belonging to the defendant, Frank Simmons. When Simmons was confronted with this evidence, he admitted killing all three of the people heretofore mentioned.

In his testimony at the trial Simmons attempted to justify the crimes by asserting self-defense. He testified that Watkins got out of the car and that he (the

defendant) thought himself in great danger and gave that as his excuse for killing Watkins. He further testified that Wells leaned forward in the car and he, the defendant, shot Wells. But the defendant gave no explanation for shooting him twice, once in the back of the head and once in the side. The defendant testified that he then became alarmed and ran from the scene of the killing, but returned a short time later, and the woman said to him: "You God-dam son-of-a-bitch you kill me;" and then the defendant said, "and I did."

In my opinion, the circumstances alone are sufficient to support a verdict of murder in the first degree, and when the testimony of the defendant, given in his own behalf at his trial, is considered along with the circumstances, not only is murder in the first degree proved beyond a reasonable doubt, but is proved beyond any shadow of a doubt. Here are some of the circumstances that shed light on the occurrence, as will be hereafter pointed out:

The victims' car was parked on the shoulder of the road about 1 foot from the ditch on its proper side of the road.

The road is 17 feet wide.

There was ample space for other cars to pass.

Only the parking lights on the car were burning.

The first person the defendant killed was Watkins. When shot, Watkins was standing against the car door, which was closed. His blood ran down the side of the door.

The defendant fired four times, each shot taking effect. He was standing close to the car when three of the shots were fired; three of the empty shells which had been fired from defendant's 16 gauge gun were found within 4 feet of the left door of the victims' car.

The back windows were up (closed) on the car in which Wells was sitting on the back seat, and Hattie Mae Williams was sitting on the front seat. The win-

dows were not broken. Defendant's gun barrel must have been practically sticking through the open window on the left front door. The woman was sitting on the right side of the front seat and she was shot in the left temple.

Wells, for whose murder the defendant was tried, must have turned away when the woman was shot, as he was shot in the left side near the back, and another load of shot hit him in the back of the head.

Although defendant claims he was only going to call the officers and report the immoral conduct of his victims, he placed his shotgun in his car.

Without a doubt he put the gun in his car with the intention of shooting someone. He makes no claim that he was going squirrel hunting when he put the loaded gun in his car.

The persons he intended to kill were the persons he did kill. No one else was involved. This fact in itself is sufficient to make a case for the jury on the issue of first degree murder.

All of the victims of the killings were unarmed.

The following is the defendant's testimony as to the actual killings: "I went and got my car and cranked up and backed up and came on down. They had done moved from where they were at. I heard the car when it cranked up and I thought sure they were coming again. A little branch down the road, a little bridge, and they were just over that bridge, just barely room enough for a car to pass with a pretty good driver. I squeezed by and just as I got even they cranked up and I just cut across the road coming by and I held the center of the road and I seen they were driving past and I pulled over and they just whipped over right ahead of me and stopped. I hit my brakes and pulled over to the left, going past them, and one man jumped out of the car, the man driving jumped out of the car, and got right in the road and said, 'Stop, stop, you Goddam son-of-a-bitch. Where you going?' I

said, 'I am going to call the law to you all.' He said, 'Yeah, you are going to call the law — Goddam you, don't you know I am going to kill you?' Nothing to do but protect my life. This other man said, 'Kill the son-of-a-bitch, kill him.' He got up, and I don't know whether it was a 2-door or 4-door, and he came up and stuck his head over the front seat of the car and I shot them both.'' Later, he returned and killed the woman, as above mentioned.

The defendant's testimony, when viewed in the light of the proven facts in the case, shows conclusively that he did the killing because he was mad; he acted with malice, after premeditation and deliberation. According to the evidence, it was not necessary that he kill any one in order to protect himself. The undisputed evidence shows that the victims' car was parked on the side of the road, with the parking lights on. There was ample room for other cars to pass. In fact, according to the testimony of the defendant, he had passed the car occupied by those he killed before he ever stopped his car. It was not necessary for him to stop his car at all if he were going to a telephone to report the conduct of the victims of his anger. The jury would have been completely justified in disregarding his statement that he was going to a telephone, but, even giving him the benefit of telling the truth on that point, there was nothing to hinder him from continuing on his way to the phone. He was in his automobile, the other car had stopped; he had passed the other car; there was nothing to keep defendant from continuing on his way; he was between the other car and the telephone. The victims of the killings were unarmed; there is no contention that they made a display of any kind of weapon — of course, they could not make such a display because they had no weapon.

It appears from the evidence that this is what happened: The defendant had made arrangements to kill hogs that morning; in all probability, his story about squirrel hunting is made out of the whole cloth, and not a word of truth in it. Ordinarily, a person does not go

squirrel hunting for a short period of time and it is not likely that the defendant would go squirrel hunting on a morning when he had made previous arrangements to kill hogs. The evidence justifies the conclusion that defendant came upon the two men and the woman parked in an automobile on the side of the road. They probably gave him a cursing, and the defendant simply went home, got his shotgun, followed them up and killed them. According to the undisputed evidence, at the time the defendant stopped his car and got out, the victims of his anger were in a car parked on the proper side of the road — on the shoulder of the road only 12 inches from the ditch. The parking lights were burning. According to the defendant's testimony, he passed the car and there was nothing to prevent him from continuing on his way to a telephone if he were going to a telephone. But, instead of continuing on his way, he stopped, got out of his car, and started shooting. Undoubtedly Watkins was standing in the road, leaning against the door of his parked car when he was killed. He was found in the road at the door of the car, and his blood had run down the door. In order to kill the other two occupants of the car it was necessary that the defendant walk back to a point where he could stick the shotgun through the open window of the left front door, because the windshield was not broken and the rear windows of the car were not broken, although they were closed.

A repeating shotgun does not eject the shells to the front. They are ejected to the side and rear of the one using the weapon. The empty shells were found within four feet of the left front door of the car. This proves without a doubt that the defendant was standing right at the front door when he shot the woman and Wells. It will be recalled he was tried for killing Wells. Not only did the defendant shoot Wells once, but he shot him twice; either shot would have caused instant death. At that close range a shotgun is the most deadly and destructive of any gun. Wells was shot in the back of the head and could not have been making any movement toward the defendant. The jury was completely

justified, by the evidence in the case, in reaching the conclusion that the killing was committed in cold blood, with malice aforethought after deliberation and premeditation. The jury system may not be perfect, but it is certainly the best system that has ever been devised by man up to this hour. The defendant in this case had a fair trial before a fair judge, a fair prosecuting attorney, and a fair jury in the county in which the crime was committed, where the defendant had lived all of his life; and he was defended by most able counsel. It is clear from the record that nothing was said or done to arouse passion or prejudice against the defendant in any manner.

The killing of the two men and the woman was so closely connected in point of time as to be a part of one transaction, and hence, all of the evidence relating to the various killings was admissible in evidence. The manner of the killing of the woman in itself shows the defendant's frame of mind at the time he committed the crimes. He makes no contention that the woman was making any movement or display against him in any manner whatever. In her horror as to the crimes that had been committed, she merely said, why don't you kill me? This was at a time after the defendant had left the scene and returned, and his reaction to the woman's question was: "And I did.", meaning that he deliberately shot her down in cold-blooded murder. He did shoot her down in deliberate, cold-blooded murder, but the circumstances indicate that he killed her before he killed Wells, who was sitting in the back seat. The overwhelming evidence in this case supports the jury verdict and, in my opinion, the judgment should be affirmed. Therefore, I respectfully dissent, and I am authorized to say that Mr. Justice GEORGE ROSE SMITH joins in this dissent.