| 82 | 97 |
| 84 | 297 |

</div>

## HOWARD *v.* STATE.

### Opinion delivered March 4, 1907.

HOMICIDE—CONVICTION OF MURDER—REDUCTION OF DEGREE.—A conviction of murder in the first degree will be reduced to the second degree where the evidence shows that the killing was done with a deadly weapon but without deliberation or premeditation.

Appeal from Union Circuit Court; *George W. Hays,* Judge; punishment reduced.

*W. E. Patterson,* for appellant.

1. Appellant should have been granted a new trial because of newly discovered evidence—matters known to the defendant, it is true, but of the legal effect of which she was utterly ignorant, and which were not disclosed to her counsel until after the trial.

2. The evidence was not sufficient to sustain a verdict for murder in the first degree. To authorize such a verdict, there must have been a specific intent to take life formed in the mind of the slayer before the act of killing. It must have been willful,

deliberate, malicious and premeditated. 31 Ark. 189. For distinctions between degrees of murder see 52 Ark. 345; 55 Ark. 556; 56 Ark. 8.

3. The evidence was insufficient to identify defendant with the killing of deceased.

*Wm. F. Kirby,* Attorney General, and *Daniel Taylor,* for appellee.

1. It is only in case of manifest abuse of the discretion vested in the trial court that this court will interfere to grant a new trial on account of newly discovered evidence. 28 Ark. 124. Motions for new trial on this ground must "be sustained by affidavits showing their truth." Kirby's Digest, § § 6215, 6219. The grounds alleged as "newly discovered evidence" in this case can not be held to come within the meaning of that term. See 17 Ark. 404; 28 Ark. 121; 29 Ark. 62; *Id.* 229; 33 Ark. 180; 38 Ark. 498; 41 Ark. 229; 54 Ark. 364.

2. The evidence is ample and legally sufficient to sustain the verdict.

RIDDICK, J. This is an appeal by Dinah Howard, a negro woman, from a judgment of the Union Circuit Court for the Eastern District convicting her of murder in the first degree for shooting and killing J. W. Morrison, the town marshal of Huttig, and sentencing her to be hanged. The murder charged against the defendant was alleged to have been committed on the 20th of June, 1906, and the circumstances under which it was committed briefly stated are as follows: Dinah Howard, on the night previous to the night on which Morrison was shot, had a quarrel with Richard Givens, a negro man, and in a struggle betwen them a pistol was fired, and Givens was killed. She testified that the quarrel arose over the payment of six dollars which Givens owed her, and to secure the payment of which he had pawned his pistol to her, and that in the struggle the pistol was accidentally discharged, and Givens killed. The court permitted the prosecuting attorney to show that she had made statements tending to show that the killing of Givens was intentional. No objection was made to this evidence, and we need not consider it here, for whether she shot Givens intentionally is not material in this case. It is a fact that Givens was killed, and that there were reasonable grounds to believe that defendant had taken his

life unlawfully and was endeavoring to escape. The county in which the crime was committed adjoins the Louisiana line, and the evidence shows that the intention of the defendant was to evade arrest by escaping into Louisiana. The information that Givens had been killed by defendant coming to J. W. Morrison, who was marshal of the town of Huttig and, it seems, also deputy sheriff of the county, he at once took steps to apprehend and arrest the defendant. During the day following the night Givens was killed Dinah Howard, the defendant, remained in hiding in a negro cabin at a place called Dollar Junction about two miles from Huttig, and the officer did not find her until the following night. By the aid of Eugene Gilberry, a negro man, the officer ascertained her place of hiding, and also learned that it was her intention to walk that night to Monroe, Louisiana, with Gilberry and Kid West, two negro acquaintances. Gilberry did not in fact intend to aid her to escape, but under pretense of aiding her he intended by a plan prearranged with the officers to lead her to a place where she would be arrested. Just before the time when West and Gilberry were to go to the cabin where the defendant was in hiding West was arrested and placed in custody by the officers. Gilberry then went to the cabin and told the woman that he was ready to start, and that West was waiting to go with them. The defendant disguised herself by putting on men's clothing, and then went out with Gilberry as she supposed to meet West. Gilberry ascertained that she had a pistol with her in the pocket of the coat that she wore. After they had gone a short distance they stopped, and Gilberry told her to remain there until he went for Kid West. Gilberry then went to where Morrison and S.. C. Powell, who had been summoned to aid in the arrest, were stationed. He told them that the woman had a pistol and might hurt some one, and he asked if it would not be better to allow him to shoot her. Morrison told him no, but directed that, when Gilberry and the woman came up close to the officers, Gilberry should grab her around the arms so that she could not use them. It was then agreed that when the officers approached Gilberry and the woman he should ask, "Is that you, Kid West?" and that one of the officers should answer, "Yes." Gilberry then returned to the woman, and under pretense of taking her to meet West he walked with her towards

the officers. Morrison, the officer, to avoid recognition and facilitate the arrest, had disguised himself by putting on an old hat and a coat owned by Dr. Perrin. It was about ten o'clock P. M. The night was very dark with a misty rain falling, so that it was impossible to distinguish any one more than a few feet away. As Gilberry and the woman approached the officers, he asked the question, "Is that you, Kid West?" to which one of the officers responded, "Yes." Then when they were only a few feet from the officers Gilberry suddenly grabbed the woman by the right arm, and Morrison reached forward towards her and said, "Oh yes, I have you at last." Whereupon the woman instantly jerked the pistol from her pocket with her left hand, and fired several times rapidly, and then ran. When the firing commenced, Gilberry let go her arm, stepped back, drew his pistol, and commenced to fire at her. Powell also fired his pistol, and supposed he had shot the woman, though the night was so dark he was unable to see more than her form or to tell whether she was dressed in man's clothing or not, and it is possible she had already fled when he began shooting. The last shot fired by Gilberry was fired in the direction of Powell. Powell then told him to mind where he was shooting, and asked him where Morrison was. Gilberry replied, "Back of you, and I think shot." They then went back and found that Morrison was wounded and unable to speak. He had been struck by a ball from a pistol in the left breast, and died in a few minutes. The defendant remained out in the woods that night. She came up to a negro cabin next morning, stated that she had killed a negro man two nights before, and that a white man had been killed at Dollar Junction the night before. She asked for a change of clothing and permission to stay in the garden, and was arrested there some hours afterwards.

The defendant in her testimony on the trial denied that she had any pistol with her on the night that Morrison was killed, or that she was present when Morrison was killed, though she admits that she was with Gilberry shortly before the shooting, and that she intended going with him and West across the State line. But the evidence, we think, shows clearly that defendant was present, and that she fired the shot that killed Morrison. It is true that the evidence tends to show that the negro Gilberry,

who was assisting in the arrest, did some wild shooting, and that his last shot was fired in the direction of Powell, and that Morrison was at that time beyond Powell from Gilberry. It is, of course, possible that firing in the intense darkness his shot may have killed Morrison. But the testimony of both Powell and Gilberry tends strongly to show that the defendant fired the shot that killed Morrison. The circumstance that Morrison, though he was armed with a pistol, took no part in the shooting but staggered away, tends to show that he was probably struck and mortally wounded by one of the first shots fired, and the evidence all shows that the woman began firing first immediately upon being seized by the negro and approached by the officers.

After considering the evidence, we feel no doubt that the defendant is guilty of some degree of homicide, and the main question is whether the evidence is sufficient to sustain a verdict of murder in the first degree. In order to constitute murder in the first degree, not only malice but premeditation and deliberation must be shown. The distinctive feature of murder in the first degree said Mr. Justice SCOTT in *Bivens* v. *State,* 11 Ark. 460, is "a wilful, deliberate, malicious and premeditated intent to take life." And, although it is not indispensable that the premeditated design should have existed in the mind of the slayer for any particular length of time before the killing, yet he says that to constitute murder in the first degree it is indispensable that the evidence should show that the killing was not only done with malice, but that it "was preceded by a clearly formed design to kill—a clear intent to take life."

In a later case in an opinion by Chief Justice ENGLISH it was said that "to constitute murder in the first degree there must be a specific intent to take life formed beforehand and carried out with deliberation." *Fitzpatrick* v. *State,* 37 Ark. 239. Both of these declarations of the law have often been approved in the decisions of this court. *Sweeney* v. *State,* 35 Ark. 585; *Casat* v. *State,* 40 Ark. 524; *Green* v. *State,* 51 Ark. 189; *Palmore* v. *State,* 29 Ark. 248, 265; *King* v. *State,* 68 Ark. 572; 21 Cyc. 726, and cases cited.

Now, applying these definitions of murder in the first degree to the facts of this case, what is there to show a deliberate and premeditated intent to take life, or, to use the language

of a decision just referred to, what is there to show an intent to take life formed beforehand and carried out with deliberation on the part of this defendant? The evidence indeed shows a killing with a deadly weapon from which we may, in the absence of proof to the contrary, infer malice. But, though malice may be presumed, premeditation and deliberation are not presumed from the mere fact of a killing by the use of a deadly weapon, but must be shown by the manner of the killing and the circumstances under which it was done or from other facts in evidence. *Simpson* v. *State,* 56 Ark. 8; 21 Am. & Eng. Enc. of Law (2 Ed.), 163. If the law were otherwise, and premeditation and deliberation were presumed from the use of a deadly weapon, then all or most murders committed by the use of deadly weapons would be murders in the first degree. But it is evident that the statute did not intend that this should be so, but only that those murders committed in the attempt to perpetrate certain crimes named in the statute or that were deliberate and premeditated should be murders in the first degree. All other murders are of the second degree.

It is true that the motives and intention of any one may be judged by what he does. If one takes a gun and without provocation shoots and kills another, the jury may infer from these acts an intent to take life, and may convict the offender of murder in the first degree. If one charged with a crime, in order to prevent arrest, shoots and kills the officer lawfully attempting to arrest him, the jury may find a deliberate intent to kill. But, though the defendant in this case was attempting to evade arrest, the evidence does not show that she knew that she was resisting an officer at the time she fired the fatal shot, for the night was dark, the officer was in disguise and did not make known his intentions. Our statute provides that one making an arrest "shall inform the person about to be arrested of the intention to arrest him and the offense charged against him for which he is arrested, and, if acting under a warrant of arrest, shall give information thereof, and, if required, show the warrant." Kirby's Digest, § 2124.

It may not be practicable for an officer to follow this statute strictly in all cases, and his failure to do so does not justify the person he is trying to arrest in taking his life. *Appleton* v.

*State,* 61 Ark. 590. The officer in this instance may have con-
cluded that it was necessary to proceed secretly and in disguise
in order to capture the defendant, who was endeavoring to evade
arrest. But, while there may be nothing in this that calls for any
criticism of the officer who, so far as the evidence shows, was
actuated only by a commendable desire to arrest one fleeing from
justice, yet these facts must be considered in judging the acts of
the defendant. At the time of the tragedy she was being piloted
through the dark night by one whom she supposed was her
friend. She expected in a few moments to meet another friend
and with these men to go across the State line. The one with
her calls out to the other friend and some one answers. Ex-
pecting to meet this friend, she is suddenly seized by the one who
is with her, while some one reaches out from the intense dark-
ness, as if to seize her, saying, "I have got you at last." Without
knowing, without opportunity to know, who they are that assault
her or what their purpose is, she instantly jerks the pistol from
her pocket, fires several times, and flees into the darkness.

It may be that she saw that the man reaching out to catch
hold of her was white, and, as she probably knew that the officers
were looking for her, that it flashed upon her that these were the
officers attempting to arrest her. But the evidence shows that
the shooting was the result of a meeting altogether unexpected
by her, that it came about suddenly by reason of the unexpected
and sudden manner in which the arrest was attempted, and more
than likely as a result of sudden fright. It is not shown that
she had made any threats or had designed any forcible resist-
ance. The statement of the negro Gilberry to the officers that
she had a pistol and might shoot was not made in her presence
and was not evidence against her. Besides, it shows nothing but
the fact that she had a pistol, and that he was apprehensive that
if the officers came upon her suddenly in the darkness as planned
she might use the weapon. As we have said, the mere fact that
she had a weapon and used it is not of itself sufficient to show
premeditation and deliberation. If the officers had approached
in the day time, or if they had made themselves known before
attempting to catch hold of her, then the use of the pistol under
such circumstances might have justified the jury in finding that
it was done with premeditation and deliberation. For it is a duty

to submit to lawful arrest. If one refuses to do so, "passion becomes wickedness, and resistance crime." Sherwood, J., in *State* v. *Evans*, 161 Mo. 95-112. But the officers here approached under cover of intense darkness; they did not make themselves known, but were disguised; and if the defendant recognized them at all, it was at the moment of shooting. Instead of the killing being deliberate and premeditated, the evidence shows that probably the very cause of it was that the defendant had no time to consider and acted from sudden impulse. The next day when arrested she made no resistance whatever, and it seems not improbable that, had she known at the time of the shooting who the officers were, and had she but had a moment's time to consider the matter, then this crime would not have been committed.

The statute declare that, to constitute murder in the first degree, the killing must be "wilful, deliberate, malicious and premeditated." Kirby's Digest, § 1766. After a careful consideration of the evidence, we are of the opinion, as before stated, that the evidence does not show that this was a premeditated or deliberate killing. On the contrary, we think it conclusively shows that it came about for the very reason that the defendant was suddenly pounced upon in the dark and acted like a frightened negro woman with a pistol in her hand might be expected under such circumstances to act. She fired the pistol until it would fire no longer and then ran. The use of a deadly weapon in that way might justify a conviction of murder in the second degree, but for the reasons stated, we are of the opinion that it does not show murder in the first degree.

The case then comes within the rule of *Simpson* v. *State,* 56 Ark. 8. The verdict stands for the offense of murder, but fails as to the degree. The case is in the same situation as if the jury had found the defendant guilty of murder in the second degree, but failed to assess the punishment. We will set aside the judgment for murder in the first degree, and affirm it for murder in second degree, and will assess the punishment at imprisonment in the penitentiary as provided by the statute.

BATTLE, J., concurs in the opinion that the evidence is not sufficient to sustain murder in the first degree, but for the reasons stated in his dissenting opinion of *Simpson* v. *State, supra,* is of the opinion that the case should be remanded for a new trial.