BLAKE *v.* STATE.

Crim. 3794

Opinion delivered July 4, 1932.

*C. M. Martin* and *Scipio A. Jones,* for appellant.

*Hal L. Norwood,* Attorney General, and *Robert F. Smith,* Assistant, for appellee.

SMITH, J. Appellants, Louis and Elbert Blake, who are father and son, have prosecuted this appeal from the judgment of the Ouachita Circuit Court sentencing them to death for the murder of Brad Polk. The testimony on the part of the State was to the following effect. Louis Blake was a tenant on the farm of Polk, and they had disagreed about Blake's account and had been unable to effect a settlement. Blake had stated that he would not leave the farm where he lived until a settlement had been effected, and that he would kill Polk, if necessary, to secure a settlement. This threat was made in the presence of Walter Jones about 10:30 at the People's Bank in Stephens, Arkansas, on the morning of the day before the killing. Louis Blake owned a pistol, which he had been known to carry. Polk went to Blake's home at about noon on Christmas Day to effect a settlement. This conclusion was arrived at from the following facts. When deceased was found after he had been shot, it was discovered that he had been shot in his left eye. Deceased's glasses were found upon his breast with the left lens shot out. Polk used his glasses only when reading, and an envelope was found in his pocket covered with figures. The Blakes were in their home when the fatal shot was fired. The elder Blake fired four shots. His son fired only once, but this was the fatal shot, and it struck Polk while the latter was standing near the porch on the outside.

Louis Blake denied making the threat about which the witness Jones testified, and two other witnesses testified that at the time when the alleged threat was made Louis Blake was not at the bank but was at work on the house of a Mr. Guttry. This, however, was a question of fact for the jury.

Louis Blake admitted that he and Polk had disagreed about their settlement.

This testimony, standing alone, might, with the inferences reasonably deducible therefrom, support the finding that the Blakes had killed Polk after deliberation and premeditation, and were therefore guilty of murder in the first degree as found by the jury. But it does not stand alone. There are certain other facts which cannot be ignored, although we may say that the jury had the right to disbelieve the testimony of the defendants as to the circumstances under which the fatal shot was fired, according to which the killing occurred in their necessary self-defense and in defense of their home and the protection of its inmates from a murderous assault.

After the shooting, young Blake ran away, but he was later arrested. The older Blake went at once to the home of the deceased and informed deceased's daughter that Elbert Blake had shot her father, and he went with her for a doctor. The doctor—Dr. Sanders—went at once to the scene of the killing. Polk was dead when he arrived, having been killed instantly. Deceased's glasses were lying across his chest, they having apparently fallen off his face. Deceased had a pint of liquor in his left hip pocket, but none of it had been consumed. Other witnesses testified that Polk had not been drinking that day. Deceased's pistol was found lying near his feet.

R. L. Elliott, a deputy sheriff who investigated the killing and arrested Louis Blake, arrived at the scene of the killing a short time after it had occurred. He and others searched the house and found two pistols, one of .38 caliber, the other .45 caliber Colt's revolver. There were four empty shells in the .38 caliber pistol and one in the .45. In regard to bullet holes found in the Blakes' home, Elliott testified as follows: "Q. Did you examine the house to ascertain whether or not any bullet holes were in it? A. Yes, sir. Q. What did you find? A. There were three bullet holes through the wall and one bullet was taken about the door, it went in straight, and there was a bullet fired from the outside that went through the window sash and through a 2 x 4 and then stuck into the wall. There was a bullet hole up over the door,

kind o' at the corner of the door facing. Q. What was your statement with reference to the window? A. That was fired from the door, whoever fired it was on the outside of the door. Q. The bullet that went through the sash was fired from the outside? A. Yes, sir, and went to the corner of the building on the inside."

The sheriff, who also examined the house in which the Blakes lived, testified that he found where three shots had been fired from the inside of the house through the wall thereof and one through the window from the inside, but he also found one which had been fired from the outside, there being one or two shots over the door. Louis Blake, when first arrested, denied that he had fired any shot, but later admitted that he had shot three or four times through the wall of the house.

A witness who was hunting near the Blakes' home testified that he heard the report of the guns, and that all of the shots were fired within a short time of each other, and he and other hunters with him supposed that other hunters were shooting birds.

We have concluded that, while this testimony is sufficient to support a verdict of murder in the second degree, it is not sufficient to support a verdict of murder in the first degree. We think there is lacking that deliberation and premeditation required to constitute the higher degree of murder. The appellants were in their home at the time of the shooting, and, while the jury evidently did not believe their testimony that deceased began the shooting, it is certain that he participated in it. Guests present in appellants' home to partake of a Christmas dinner, then about ready to be served, testified that when they saw deceased coming to appellants' home they thought there would be trouble, and they left hurriedly, and that immediately after they had left the house through a rear door the shooting began, but they did not know who had commenced it.

In numerous cases this court has announced the power of the court to reduce a punishment imposed upon the verdict of a jury. One of the leading cases is that

of *Routt* v. *State,* 61 Ark. 594, 34 S. W. 262, in which a defendant had been convicted of robbing one Morgan of several hundred dollars. The court was of the opinion that, while the testimony established the fact that Routt had stolen Morgan's money, it did not suffice to establish the crime of robbery. In discussing the power of the court to reverse the judgment of the trial court convicting appellant of robbery and to reduce the punishment to that appropriate for grand larceny, the court pointed out that ''the charge of robbery made against the defendant includes larceny,'' and the judgment of imprisonment for robbery was set aside, and the case remanded with directions to the circuit court to sentence the prisoner for grand larceny.

In discussing this power of the court, Justice RID-DICK there said: ''Our statute provides that 'the Supreme Court may reverse, affirm or modify the judgment or order appealed from, in whole or in part, and as to any or all parties, and when the judgment or order has been reversed, the Supreme Court may remand or dismiss the cause, and enter such judgment upon the record as it may in its discretion deem just.' Sand. & H. Digest § 1064. We have twice held that this statute applies to judgments in criminal as well as civil cases. *Simpson* v. *State,* 56 Ark. 19, 19 S. W. 99; *Brown* v. *State,* 34 Ark. 232.''

It was there also said: ''We have said that the evidence does not sustain the charge of robbery, but that it does clearly make out a case of grand larceny. The fact that the defendant was found guilty of a greater crime than was warranted by the evidence does not compel us to set the entire conviction aside when it is in part clearly correct. It was to avoid such an unreasonable and costly procedure that' the statute above referred to was enacted. The defendant in this case was sentenced to be imprisoned for ten years, when the maximum punishment for larceny of money is imprisonment for five years. Under the statute and the authorities cited above, we will relieve the defendant from the ex-

cessive judgment, of which he has a right to complain, but affirm the conviction to the extent that it seems clearly right. The judgment of imprisonment for robbery is set aside, and the cause remanded, with an order that the circuit court sentence the prisoner for grand larceny.''

This power has frequently been exercised by this court in subsequent cases, and, while the practice usually followed is to reverse the judgment on account of the excessive punishment, unless the Attorney General will consent that the trial court impose a lower sentence, that practice has not always been followed. The court, when it is thought proper to do so, has itself fixed the reduced punishment.

One of the first cases in which this was done was that of *Howard* v. *State,* 82 Ark. 97, 100 S. W. 756. The headnote in that case reads as follows: ''A conviction of murder in the first degree will be reduced to the second degree where the evidence shows that the killing was done with a deadly weapon but without deliberation or premeditation.'' The court there said: ''We will set aside the judgment for murder in the first degree, and affirm it for murder in the second degree, and will assess the punishment at imprisonment in the penitentiary as provided by the statute.'' The final judgment of this court in that case shows that the punishment imposed by this court, after reversing the death sentence, was imprisonment for twenty-one years, the highest punishment provided by law for murder in the second degree.

Other cases in which this court has itself reduced the punishment are as follows: *Williams* v. *State,* 66 Ark. 264, 50 S. W. 517; *Noble* v. *State,* 75 Ark. 246, 87 S. W. 120; *Petty* v. *State,* 76 Ark. 515, 89 S. W. 465; *Walker* v. *State,* 91 Ark. 497, 121 S. W. 925; *Quinn* v. *State,* 114 Ark. 201, 169 S. W. 791; *Trotter* v. *State,* 148 Ark. 466, 231 S. W. 177; *Williams* v. *State,* 183 Ark. 870, 39 S. W. (2d) 295; *Stanley* v. *State,* 183 Ark. 1093, 43 S. W. (2d) 415.

The judgment of the court below sentencing the appellants to death will therefore be reversed, and the

judgment will be modified by reducing their conviction to that of murder in the second degree, and a sentence of twenty-one years upon each of them is hereby imposed.