Ezell v. State.

4597                                             229 S. W. 2d 32

Opinion delivered April 10, 1950.

Rehearing denied May 8, 1950.

*Ralph E. Wilson* and *Mitchell D. Moore,* for appellant.

*Ike Murry,* Attorney General, and *Robert Downie,* Assistant Attorney General, for appellee.

Minor W. Millwee, Justice. Appellant, Matthew Ezell, was convicted by a jury of murder in the first degree and his punishment fixed at death. He has appealed from the judgment rendered in accordance with the jury's verdict.

The testimony tends to establish the following facts: L. J. Wood lives in the Jacksonville Community in Mississippi County. About 7:30 o'clock Sunday morning, April 24, 1949, Jimmie Wood, son of L. J. Wood, went to his father's pasture to round up some horses. As he crossed a levee which runs through the pasture, he heard some dogs barking. Upon investigation he discovered the body of a young Negro girl lying near the bottom of the river side of the levee. He returned home and called Cliff Cannon, deputy sheriff, who examined the body and summoned the coroner and sheriff.

The deceased child's mother, China Flowers, and grandmother, Alice Gray, appeared at the scene and identified the eight-year-old child. A coroner's jury was empanelled and an inquest held that afternoon and completed the next day.

Appellant was at that time living in a three-room house on the Bryant farm with Alice Gray, China Flowers and her five minor children and was employed as a farm laborer. The house was located about 900 feet from the place where the child's body was found. About a year before appellant had lived with Alice Gray for about two or three months at Crawfordsville, Arkansas, and appeared at the Flowers home in Jacksonville about four days prior to the child's death.

The child was sleeping with her six-year-old sister when China Flowers retired about 11 o'clock Saturday

night. Alice Gray slept in another bed in the same room with two of the children. China Flowers slept with her youngest child in an adjoining room in which appellant also slept on a cot. Alice Gray returned from a visit at the home of a sick neighbor late Saturday night and retired in the dark, explaining that there was no burner in the oil lamp. Appellant came in some time later and was asleep on the cot when China Flowers discovered that the child was missing shortly after sunrise Sunday morning.

Appellant was questioned by the deputy sheriff at the house about noon Sunday and taken into custody on suspicion of murder. He was present at the coroner's inquest the next morning and testified in detail how he had taken the sleeping child from her bed, choked her to death and carried her to the place where the body was found. Prior to the inquest appellant had voluntarily made similar statements to the deputy sheriff and coroner. In each of the statements he said that Alice Gray had suggested that he "get rid" of the child, but that she had given no reason therefor; and that she went with him to the levee and directed him where to place the body. He later voluntarily retracted this part of the statement and said he had implicated the child's grandmother because he thought it might make his punishment lighter.

Appellant interposed the defense of insanity. He was committed to the State Hospital for examination and observation on August 26, 1949, and discharged on September 26, 1949. Dr. Oscar Kozberg, assistant superintendent of the hospital testified in detail as to the physical and mental examination and stated that in his opinion appellant was sane at the time of the examination and at the time the alleged crime was committed. He stated that appellant was normal physically; that the tests for syphilis were negative; that appellant was able to work simple problems in arithmetic; and that he found no evidence of hallucinations or other signs of mental incompetency.

Dr. P. W. Turrentine, a general practitioner, testified on behalf of appellant after talking with him about

one and one-half hours two days before the trial. Although he would not say that appellant was insane, nor that he did not know the difference between right and wrong, he disagreed with Dr. Kozberg's conclusion that appellant was without psychosis. It was his opinion, based on the conversation, that appellant had mental aberrations, was highly illogical and unable to place his experiences as to time and place. However, appellant told Dr. Turrentine that he was drinking on the night in question and was taken home by some associates; that after going to bed he got up and took the sleeping child from her bed and carried her to a table where he choked her and attempted to have sexual relations with her and then choked her some more until she died. It was the doctor's impression that appellant's conduct was motivated by an insatiable appetite for alcohol which in turn caused an irresistible sexual urge and compulsion to kill.

The first assignment of error in the motion for a new trial is as follows: "There was no corroborating evidence by the State of Arkansas to prove that a crime had been committed in this cause, except the testimony and confession of the defendant, Matthew Ezell, which was not made in open court." Our statute (Ark. Stats. 1947, § 43-2115) provides that an extrajudicial confession of the defendant must be corroborated by proof of the *corpus delicti*. It was suggested by the state in the oral argument that the confession of appellant at the coroner's inquest was a judicial confession, that is, made in open court, and, therefore, sufficient to sustain a conviction without corroboration. We find it unnecessary to determine this question. Although there is authority that may be said to support the state's contention,[1] we will assume for the purpose of this opinion that the confession at the coroner's inquest was quasi-judicial and as falling under the rule applicable to extrajudicial confessions. See Wharton's Criminal Evidence (11th Ed.) Vol. 2, p. 967.

---

[1] *Skaggs* v. *State*, 88 Ark. 62, 113 S. W. 346; *Ex parte* Anderson, 55 Ark. 527, 18 S. W. 856.

We have held that the extrajudicial confession of the defendant accompanied by proof that the offense was actually committed by someone will warrant his conviction. *Melton* v. *State,* 43 Ark. 367. In construing the statute in *Burrow* v. *State,* 109 Ark. 365, 159 S. W. 1123, the court said: "Under the above statute, where the offense charged is shown by other evidence to have been committed, then the party charged may be convicted upon proof of his confession, although made out of court; and where the offense is shown by other evidence than that of the accused's confession out of court to have been committed, then his confession will be sufficient to warrant his conviction, whether there is any other testimony tending to connect him with the crime or not."

In *Harshaw* v. *State,* 94 Ark. 343, 127 S. W. 745, Judge WOOD, speaking for the court, said: "It is not essential that the *corpus delicti* be established by evidence entirely independent of the confession, before the confession can be admitted and given probative force. The confession may be considered in connection with other evidence tending to establish the guilt of the defendant. But, if there is no other evidence of the *corpus delicti* than the confession of the accused, then he shall not be convicted alone upon his confession. *Hubbard* v. *State,* 72 Ark. 126, 91 S. W. 11; *Meisenheimer* v. *State,* 73 Ark. 407, 84 S. W. 494." See also, *Russell* v. *State,* 112 Ark. 282, 166 S. W. 540.

In the celebrated case of *Edmonds* v. *State,* 34 Ark. 720, this court approved the following statement from Burrill on Circumstantial Evidence: "A dead body, or its remains, having been discovered and identified as that of the person charged to have been slain and the basis of a *corpus delicti* being thus fully established, the next step in the process, and the one which serves to complete the proof of that indispensable preliminary fact is, to show that the death has been occasioned by the criminal act or agency of *another person*. This may always be done by circumstantial evidence, including that of the presumptive kind; and for this purpose a much wider range of inquiry is allowed than in regard to the fundamental fact of death, and all the circumstances of the

case, including facts of conduct on the part of the accused, may be taken into consideration.'' See, also, *Hall v. State*, 209 Ark. 180, 189 S. W. 2d 917.

The evidence in the case at bar is that the child was in good health prior to her death. When her body was found the feet were crossed and the child's clothing was wrapped tightly about her knees. There was blood in the corners of her mouth and on her tongue and it appeared that she had chewed her tongue. The body was not examined by a physician and there were no other marks found by the deputy sheriff who made the examination.

The deputy sheriff testified that, when appellant did not come with the others to the place where the body was found, he went to the Flowers house about noon and asked appellant if he knew that the girl had been found and he stated that he did. When asked why he didn't come up there, he stated that he was out all night, just sleepy and wanted to rest awhile. Appellant was sober and also told the officers that the little girl was ''bad to walk in her sleep.''

We conclude that the jury was warranted in finding from the facts and circumstances, independent of the confession, that the child did not die a natural death but was choked to death by someone. Hence, there was sufficient evidence to establish the *corpus delicti* and corroborate the confession. It is, of course, to be conceded that a stronger case might have been made if a physician had been summoned and expert testimony used.

The next assignment of error is that the court improperly admitted the confession of appellant made at the coroner's inquest. Before giving his testimony at the inquest appellant was questioned by the deputy prosecuting attorney as follows: ''Q. Matthew, we are investigating here, before a coroner's jury, the death of Ernestine Harris. Now, if you want to testify and give us a statement of what you know about this case you may do so, but it is my duty to warn you before you make any statement, that it can be used against you in the event you are tried for murder in this case. Now, if you

make a statement you will do so voluntarily; of your own free will; without any threats of punishment; with no use of force and with no promise of leniency if and when you are tried. It is also my duty to advise you that if you want to get a lawyer you can get a lawyer to advise you. You understand what I am telling you? A. Yes. Q. Now, with that understanding, do you now want to make a statement? A. Yes, sir, I do. Q. You want to tell us what you know about the case? A. Yes, I want to tell you what I know about the case. Q. Now, one other question I want to ask you before you make this statement: Have you suffered in any way from mistreatment over at the jail, or mistreatment by any of the officers? A. No, sir.'' The appellant then explained and demonstrated how he choked the child to death by use of his fingers on her throat and his hand over her throat and his hand over her nose and mouth. He also related the route he took in carrying her to the spot where the body was found.

We have held in a number of cases that admissions or voluntary statements of the defendant before a coroner's inquest are admissible in evidence on his trial. *Cole* v. *State*, 59 Ark. 50, 26 S. W. 377; *Tiner* v. *State*, 110 Ark. 251, 161 S. W. 195; *Dunham* v. *State*, 207 Ark. 472, 181 S. W. 2d 242; *Cooper* v. *State*, 215 Ark. 732, 223 S. W. 2d 507. In the Dunham case the defendant's appearance at the inquest was involuntary and we approved the following statement of the rule in 22 C. J. S., Criminal Law, § 733: ''Provided they were made voluntarily, admissions by accused at a coroner's inquest may be received against him. The fact that accused was subpoenaed, or the equivalent thereof, to appear at the coroner's inquest does not render his statements thereat inadmissible against him on a subsequent trial, if such statements were, in fact, voluntarily made.'' Under the undisputed facts in the instant case the confession was properly admitted in evidence.

The next assignment is that the court erred in refusing to give certain instructions requested by appellant. Three of the nine requested instructions would have told the jury that a specific intent to kill is an essential ele-

ment of murder, either in the first or second degree. The court properly instructed the jury that appellant could not be convicted of murder in the first degree unless he had the specific intent to kill. A specific intent to kill is not necessary to constitute the crime of murder in the second degree. *Ballentine* v. *State,* 198 Ark. 1037, 132 S. W. 2d 384. The matters contained in other instructions requested by appellant were fully covered in those given and the court is not required to multiply its instructions on a particular issue. *Wallin* v. *State,* 210 Ark. 616, 197 S. W. 2d 26. The court gave instructions, which we have repeatedly approved, covering the defenses of drunkenness, insanity and all other issues presented by the testimony.

The last three assignments of error question the sufficiency of the evidence to support the verdict. In this connection it is argued that there is no evidence that the killing was malicious or that it was done after deliberation or premeditation; and that, under the testimony, appellant was not mentally responsible for his acts. When considered in the light most favorable to the state, the evidence was sufficient to show implied, if not actual, malice and there was also sufficient evidence of premeditation and deliberation to support the verdict. The state is not bound to prove a motive for the killing and the absence thereof is only a circumstance to be considered with other facts and circumstances in determining guilt or innocence. *Hogue* v. *State,* 93 Ark. 316, 130 S. W. 167.

As previously indicated, the evidence as to appellant's sanity is in dispute. Appellant's mother testified that he had been "half-minded" since he suffered a spell of sickness in 1931, but there is little evidence of specific acts or conduct to substantiate her conclusion. She admitted that appellant was able to hold good jobs and stated that he would do "funny things" and had "strange ways" when drinking. Some lay witnesses described appellant as being of "average mentality" while others indicated that his mental competency was below normal. We have held that mere mental weakness or the fact that one has a mind below normal is insufficient to show insanity, and does not exempt him from re-

sponsibility and punishment for his criminal acts. *Jones v. State,* 213 Ark. 863, 213 S. W. 2d 974. The evidence is sufficient to support the jury's conclusion on the question of appellant's sanity.

We are also asked to reduce the penalty from death to life imprisonment, but the evidence does not, in our opinion, warrant the substitution of our judgment for that of the jury in fixing the punishment, if it be conceded that we have such power.

We find no prejudicial error and the judgment of the trial court is, therefore, affirmed.

DUNAWAY, J., dissents.