Herschel Glen MURRY *v.* STATE of Arkansas

CR 81-117                                    635 S.W.2d 237

Supreme Court of Arkansas
Opinion delivered June 21, 1982

*Damon Young* and *James E. Davis*, for appellant.

*Steve Clark*, Atty. Gen., by: *William C. Mann, III*, Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Herschel Glen Murry was convicted of killing his mother and sentenced to life imprisonment. He denied the act and the case against Murry was circumstantial. On appeal it is argued the conviction should be reversed because there was no substantial evidence to support the verdict and because the trial court erred in permitting law enforcement officers to testify regarding

statements Murry made to them at the initial stage of the investigation.

Actually, Murry convicted himself when he admitted writing a letter that was mailed to the Chief of Police of Ashdown, Arkansas, two weeks after the murder, and when it became obvious that Murry's first statements to the law enforcement officers could not be reconciled with an autopsy report. Those statements placed him at home with his mother at the time of the murder — not elsewhere as he testified at his trial.

Murry, seventeen, and his mother lived alone in a house trailer in Little River County near the Oklahoma state line. His mother, Nedra Sharp, who had been married twice before and was single at the time, worked as a licensed practical nurse in a nursing home in Ashdown, Arkansas. Murry had finished the eleventh grade in high school, had dropped out of school, and was working as a welder for a local man. He said he got off work about 3:00 or 3:30 p.m. on Friday afternoon, January 11, 1980, and went home. Shortly thereafter his mother arrived home. He left to check on some animal traps he had set nearby, went on into Foreman, washed his pickup truck and returned home. He told two officers his mother was eating supper when he left and he specifically recalled she was eating fish sticks. He said he did not eat. He said his mother mentioned that she was going to meet an old friend that evening from Shreveport and he did not recall the man's full name but thought he was called Lane. He said after he returned from washing his truck, he took a shower, changed his clothes, and left in his mother's Pontiac Trans Am for Betty's Place which is located in nearby Oklahoma; Betty's is a local establishment that sold beer and is frequented by young people. He and a friend played pool, later went to his friend's home and in the early morning hours of the next day he returned to the trailer. He said the lights were on, the television was on, there was blood all over the trailer, and his mother was missing. He awakened a relative of his who lived about a mile away and brought him to the trailer. The relative called the local deputy sheriff. The deputy got to the trailer at 4:09 a.m. He made a preliminary investigation. He left and then returned

with several other officers about 8:00 a.m. The officers questioned Murry about his whereabouts that night, his mother's activities and friends and what he knew about the possibility of her death. A crime scene investigation was made of the trailer and as one officer testified, it was obvious there had been a fierce struggle. Blood was on the carpet, walls, and door steps; large chunks of hair were found in the trailer and two small pieces of what appeared to be a human skull. The officers were told about the man named Lane and found that name in Mrs. Sharp's telephone book. Indeed such a man lived in Shreveport who had dated Mrs. Sharp. He was Lane Barmore. He was not her regular boyfriend; he was married, but had dated Mrs. Sharp. Several Arkansas officers went to Shreveport and with Louisiana authorities conducted an investigation. The officers were satisfied that Mr. Barmore had an honest alibi. His vehicle had been searched and inspected. Evidence of blood was found in the trunk and examined but it proved to be animal blood. He was no longer a suspect. It was not until January 24th, two weeks after the incident, that the officers said they suspected Herschel Glen Murry. That day a letter was received at the police department in Ashdown which was printed in large letters. It read:

> NEDRA WAS A GOOD PIRSON BUT SHE HAD TO DIE FOR SHE DID NOT WONT TO MARY ME. I LOVED HER BUT I HAD TO DO IT I HAIF TO KILL THE BOY TO HE WILL DIE TO I NO WHERE HE IS
>
>> I PUT NEDRA UNDER SOME TREE TOPS ABOUT 1000 YARDS EAST OF THE OLD HOUSE PLACE AT PINNEY
>
> THE BOY IS DID TO

The sheriff's office called Murry to the office. He was warned of his rights and asked to give them ten samples of his handwriting. The officers directed that he write out the contents of the letter they had received. Murry was not shown the letter; an officer read it to him. Shortly thereafter an expert concluded that Murry had written the letter. Murry

was asked about the letter, and after about two hours he admitted he had written it. He said when he was in Louisiana with relatives during the past week, a man stopped him on the road, got in his pickup truck, held a pistol on him and threatened to shoot Murry if he did not do exactly as the man said. He said the man told him he had his mother and unless he did what he was told he would kill her. He could only give a general description of the man but he said the man was very upset and crying. He said he wrote down exactly what he was told and later mailed the letter. He did not tell anyone of this incident. He still denied killing his mother or knowing anything about her disappearance. On the basis of the letter, a search was conducted in the area and eventually the body of Nedra Sharp was found on the 31st of January in a shallow grave near the old Piney Cemetery. It was near an old home place approximately one-half mile from the home of Murry and his mother. The grave was covered with dead pine tree tops and located at the edge of a sage grass field.

Other critical circumstantial evidence in this case was that Murry in conversations with at least two of the officers told them that he left the trailer at 4:30 or 5:00 p.m. to wash the truck and his mother had prepared some fish sticks before he left. He said that his mother ate her supper but that he did not. The medical examiner conducting the autopsy said that because of the weather conditions in January, the body of the deceased was well preserved and he was able to determine that Mrs. Sharp died within thirty minutes or an hour after she ate supper. He said he was able to determine this because he found undigested fish in her stomach and therefore he could estimate accurately her time of death. If Murry's first version given to the police was true, he was at the trailer when she was killed which would have been well before 8:00 p.m., which was about the time that he left the trailer that evening. He was seen in town washing his truck by his friend, Don Cleghorn. His friend testified that he saw Murry at the car wash between 6:30 and 7:00 p.m., January 11th. He said he saw what appeared to be some tufts of hair that looked like animal hair in the back of the pickup truck which Murry was washing. Murry told him he had killed a deer. Murry testified that he did tell this acquaintance that

he had killed a deer, and that he was washing out his pickup truck because he did not want to get caught by the Game and Fish people. Actually, at the trial he said he had not killed a deer that day but had killed one several days before. Murry testified that he was at the car wash between 5:30 and 6:00 p.m.

A distant relative of Murry's who lived in the vicinity said that he saw Murry as he drove by the trailer that evening shortly between 6:00 and 6:20 p.m.; it was dark. He saw Murry pull out from the trailer in his pickup truck. He said that Murry was going very slowly behind him 75 to 100 yards, and this aroused his attention because Murry usually drove fast. He said that he continued on down the road and after he topped a hill, Murry's vehicle did not follow him. Between Murry's place and the hill was the turnoff to the Piney Cemetery. This witness, Mr. John Oglesby, testified that the next day when he learned of the incident and the investigation of the possible murder, he went down the road towards the cemetery. He drove into a sage grass field near the cemetery and saw that tracks had been left by a vehicle which had large mud grip tires and it appeared that a "short gauge" vehicle had made a circle in this field. Murry owned a four-wheel drive Chevrolet Luv pickup truck which had extra large mud grip tires. The evidence showed that his mother's body was found not many feet from the tracks this vehicle had made as it turned in the field.

The medical examiner who performed the autopsy testified that Mrs. Sharp had been killed by strangulation, numerous knife wounds, and blows to her head. The pieces of skull found at the trailer came from her skull. Her voice box had been crushed in one blow when she was strangled by someone right-handed. Murry was right-handed. She had at one point been impaled on the trailer floor by a large knife. A knife which matched the wounds and cut in the floor was found about twelve feet from the body. It was identified by Murry as an old "antique" knife his former stepfather had found while working on a pipeline. The body was found wrapped in bed clothes and tied with the belt to Mrs. Sharp's robe. There was a shovel, located outside the trailer where they lived, in a hole which was being dug to house a

foundation for a C.B. radio antenna. After the body was found, one of the officers had the shovel examined and in a splintered part of the handle, was found a thread which was proven to be consistent with the fabric of the belt to Mrs. Sharp's robe. Blood specks found in the cab of Murry's truck were determined to be human blood.

On the 12th of January when Murry was asked what was missing from the place, he said that the day before he had given his mother two fifty dollar bills which she placed in her purse. The purse was evidently rifled and the money was not there. He said she had a twenty-five caliber automatic pistol which was missing. It was discovered in the pocket of a jacket found in his pickup truck the day after the murder. He said he must have carried it with him to run his traps. He said his cowboy boots with metal toe tips that he wore home from work that day, and the clothes he wore that evening were missing, as well as some bed clothes.

When Murry testified, he denied that he told the officers that his mother had eaten early that evening when he came home. He said she did not eat until he left that evening about 7:45 or 8:00 p.m. This was critical testimony, of course, because the medical examiner testified that she died shortly after she ate. Obviously the jury refused to believe Murry in his sworn testimony and chose to believe that he told the officers the truth on the morning after the murder about when she ate supper. It is also obvious that the jury rejected Murry's explanation of the letter that described where his mother was buried.

Another bizarre event occurred on June 1, 1980. Murry, while staying alone at the trailer, reported that an un-identified intruder had tried to kill him. He said he was shot at several times and had a bullet hole in the webbing of his left hand and a wound in his shoulder. An officer investi-gating the incident testified that he was of the opinion it was self inflicted.

It is argued that the State was unable to show Murry's motive for the killing. There was no evidence that there were serious problems between him and his mother or that Murry

had ever been in trouble. While there was no eyewitness to the murder and he never admitted the killing, certainly the evidence in this case would support a finding that Murry killed his mother. The law is incapable of looking into the minds of everyone accused of a crime and determining their exact thoughts, and that is particularly true in a family situation. But the jury could easily conclude that Murry became enraged that evening and murdered his mother. He testified that when he questioned her about the man named Lane she refused to tell him his name and that she had refused at previous times to tell him about things he wanted to know about her work. He admitted that she had struck him before, but that he had never struck her; he said she had cursed him before, but he had never cursed her. He said that, in effect, he had become the head of the household in recent years, taking on the responsibility of doing things that his mother could not do. It was and is, of course, a tragic case, but Murry was afforded a fair trial and there is evidence sufficient to support his conviction.

Where circumstantial evidence, alone, is relied upon, it must indicate the accused's guilt and exclude every other reasonable hypothesis. *Darville* v. *State,* 271 Ark. 580, 609 S.W.2d 50 (1980). Whether circumstantial evidence excludes every other reasonable hypothesis is usually a question for the jury. The test on appeal is whether there was substantial evidence to support the jury's verdict. Substantial evidence was defined in *Jones* v. *State,* 269 Ark. 119, 598 S.W.2d 748 (1980), as evidence of sufficient force and character to compel a verdict with reasonable certainty. It must compel the verdict without resort to speculation or conjecture. In this case it was for the jury to decide whether Murry was telling the truth about the evening of his mother's death. There was substantial evidence to support its decision.

Murry argues that the statements that he made to the officers during the two days after his mother was killed were not admissible because he was a suspect at the time and was not warned of his rights before he made these statements. The officers testified that the investigation never focused on Murry until they received the letter and this is borne out by the evidence. When the police found Lane's name and

address in Mrs. Sharp's telephone book and contacted the Louisiana authorities, an investigation was immediately conducted regarding the possibility of this man's involvement in the murder or disappearance of Mrs. Sharp. Lane Barmore was brought into the Shreveport police station on the 13th of January and his vehicle was searched. The Louisiana and Arkansas authorities concluded that he had an alibi and could not have killed Mrs. Sharp.

These statements made by Murry were all made on the 12th and 13th of January while an investigation was being conducted to see if, in fact, there was a murder and they were routine questions. He was never placed under arrest or held in custody until the letter was received and at that time he was warned of his rights. The *Miranda* rights do not attach until an investigation is focused on a suspect. *Lascano* v. *State*, 275 Ark. 313, 631 S.W.2d 258 (1982); *Miranda* v. *Arizona*, 384 U.S. 436 (1966). We cannot say the trial judge was clearly wrong in finding that the investigation had not focused on Murry at the time he made these statements to the officers. Therefore, they were admissible.

We have reviewed the record and no error is shown by the abstract of other objections.

Affirmed.