Lloyd JONES v. STATE of Arkansas

CA CR 83-144                                    668 S.W.2d 30

Court of Appeals of Arkansas
En Banc
Opinion delivered April 4, 1984
[Rehearing denied May 2, 1984.]

130

*Kincaid, Horne & Trumbo,* by: *Bass Trumbo,* for appellant.

*Steve Clark,* Atty. Gen., by: *Marci L. Talbot,* Asst. Atty. Gen., for appellee.

Tom Glaze, Judge. Appellant, Lloyd Jones, was convicted by a jury of murder in the first degree. The jury found that appellant had, with premeditation and deliberation as required by Ark. Stat. Ann. § 41-1502 (Repl. 1977), placed his 30-30 caliber rifle against the abdomen of his girlfried, Annie Terry, and shot her. Appellant was sentenced to twenty-five years imprisonment.

In this appeal, Jones raises two points for reversal. Appellant challenges the sufficiency of the evidence to sustain a conviction of first degree murder against him. He also contends that the trial court erred in not suppressing evidence against him obtained by the State's search of his home.

The facts establishing the background of appellant's relationship with Annie Terry are not in dispute. Appellant and Ms. Terry had lived together for over a year and a half. For the last fourteen months of their relationship, they lived near Paris, Arkansas. Appellant and Ms. Terry apparently cared for each other and had discussed the possibility of marriage. Ramona Whitman, who had known appellant and Ms. Terry for two years, testified, "They got along like — I guess, any other couples do." Other witnesses testified to the same effect.

The facts leading up to the shooting are not disputed either. On May 20, 1982, appellant and Ms. Terry entered the Rock Tavern around 3:00 P.M. in Paris and drank some beer. Appellant left with a friend named Jim Gilbert and went to a V.F.W. club in a nearby town and drank more beer. Ms. Terry remained in the Rock Tavern. Appellant and Gilbert returned to the Rock Tavern about 6:00 P.M. Appellant stayed there with Ms. Terry until approximately 8:30 P.M. Gilbert testified that appellant may have had as many as nine beers from 3:00 P.M. until 8:00 P.M. Appellant stated he may had had ten or twelve beers during this period. Gilbert said that Ms. Terry had two or three beers after he and appellant returned to the Rock Tavern. He also testified

that appellant and Ms. Terry were "loving, kissing and hugging each other and things like that, that night" in the Rock Tavern.

Appellant was the only witness to the shooting. The following recitation of facts is his version of the incident. He testified that he and Ms. Terry left the Rock Tavern at 8:30 P.M. and arrived home at approximately 9:15 P.M. As they pulled into their driveway, a coyote ran across the road. Appellant stated Ms. Terry said that she wished she knew how to use a gun so she could shoot coyotes. The couple entered their house, and appellant went into the kitchen. Ms. Terry went into the living room and took the 30-30 rifle off the rack. She levered the rifle and handed it to appellant when he walked into the living room. Appellant put a shell into the magazine of the rifle and levered it to show Ms. Terry how to put a bullet into the chamber. At this time, appellant was standing near the end of a couch in the living room, and Ms. Terry was standing facing him to his left. Just as appellant was trying to let the hammer down to uncock the rifle, Ms. Terry grabbed the rifle barrel and pulled it toward her, saying, "Let me see it." The rifle discharged when she grabbed the barrel. After being shot, Ms. Terry slumped down against the end of the couch.

Appellant took two or three steps to replace the rifle in its rack on the wall and then went back to Ms. Terry to see what he could do for her. He telephoned a married couple who were friends of his and asked them what to do. The friends told appellant to rush Ms. Terry to the hospital in Paris. Appellant did so, covering the thirty-minute drive down a steep, twisting mountain road in fifteen minutes. Ms. Terry was admitted to the hospital and subsequently transferred to a hospital in Fort Smith, where she died as a result of her wound.

Friends of the appellant, who met him at the hospital, testified that he was crying and seemed scared and upset. They stated that he kept referring to the incident as an accident and kept asking himself what he was going to do.

Appellant was taken by police officers to the Fort Smith

Police Station for questioning, where he was given a blood alcohol test that registered 18%. He was arrested at Fort Smith at 1:00 A.M. From Fort Smith, appellant was taken to the Franklin County Jail in Ozark, where he was interrogated by police officers at 3:40 A.M. Police officers stated that appellant consented to a search of his house during this questioning. Appellant says he did not consent to a search of his home. At approximately 5:00 A.M., police officers did search appellant's home and removed a 30-30 caliber Marlin rifle, two pieces of wood paneling from the south wall of the house, a lead projectile recovered from the wall, a cartridge casing recovered from the couch, a cartridge casing recovered from the rifle, a fiberglass fishing rod which was on the couch, and two live cartridges recovered from the gun rack; officers made sketches of the crime scene that showed a two-foot blood stain on the floor of the house, thirty-six inches from the wall, and a bullet hole in the wall, seventeen inches from the floor. The piece of paneling removed from the house had traces of partially burned gunpowder, soot, gunshot residue, particles of barium, antimony, lead, intestinal matter and blood on it. The blood and intestinal matter were not visible to the naked eye.

Appellant also testified that Ms. Terry did not know anything about guns or how to handle them but that he was experienced in handling firearms. There was testimony from appellant and some of his friends that appellant's 30-30 rifle was dangerous to handle because it had a hair trigger and because it did not have a safety device on it. The State's firearms expert testified that after a bullet is levered into the chamber of appellant's rifle, the trigger has to be pulled and simultaneously the hammer has to be slowly lowered to be certain the rifle will not discharge.

The State's evidence consisted of the testimony of an associate medical examiner and the chief criminalist of the State Crime Laboratory, detailing the results of various tests they had performed. This testimony is too extensive to set forth in toto. We do, however, relate that part of the State's experts' testimonies that conflict in several crucial respects with that of Jones'. In essence, the State's expert witnesses testified that: (1) Ms. Terry was squatting, not standing,

when she was shot; (2) Ms. Terry was very near the south wall of the living room when she was shot — not near the couch, as appellant said; (3) Ms. Terry did not grab the rifle barrel — instead she pushed it away from her in a defensive motion; (4) Ms. Terry did not lever the rifle. The associate medical examiner's autopsy of Ms. Terry showed that the bullet that killed her dropped three inches from entrance to exit in the victim's body and showed lacerations to the left side of the liver. The associate medical examiner also testified that the exit wound was blocked by part of the intestines in such a way as to prevent bleeding from the exit wound. Based on these autopsy results, the associate medical examiner stated that Ms. Terry was not standing when she was shot, but "was leaning forward and most probably squatting."

The chief criminalist testified that trace metal tests he performed on the corpse's hands indicate that Ms. Terry did not grip the barrel of the gun and pull it toward her, but rather pushed it away from her in a defensive motion. He testified further that the trace metal test results were inconsistent with appellant's statement that Ms. Terry levered the rifle before she handed it to him. The criminalist stated that his examination of the sweater Ms. Terry was wearing when she was shot and pieces of paneling taken from the crime scene containing a hole made by the bullet that killed Ms. Terry led him to believe "that this subject was most probably in a squatting position, or bending very low . . . and with the body being possibly adjacent to the wall, maybe the left shoulder or something of this closeness, or a short distance from it." He also explained the absence of blood visible to the naked eye on the paneling by observing that the pressure generated by the gun blast and the vacuum created by the bullet as it left the body would force part of Ms. Terry's intestines into the hole in her lower back created by the bullet's exit, thus blocking any blood from spraying backward toward the paneled wall. He explained the presence of a large blood stain on the floor, thirty-six inches away from the wall, by noting that as Ms. Terry was squatting, she was probably off-balance and could have fallen forward away from the wall after being shot.

Based on the foregoing evidence, the jury concluded the appellant deliberately and premeditatedly shot Ms. Terry. We must affirm the jury's verdict if there is substantial evidence to support it. *Stanley* v. *State*, 248 Ark. 787, 454 S.W.2d 72 (1970). Substantial evidence is that evidence that is of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or the other. It must force or induce the mind to pass beyond a suspicion or conjecture. *Jones* v. *State*, 269 Ark. 119, 598 S.W.2d 748 (1980). The jury may infer premeditation and deliberation from the circumstances of the case, such as the character of the weapon used, the manner in which it was used, the nature, extent and location of the wounds inflicted and the like. *See McLemore* v. *State*, 274 Ark. 527, 626 S.W.2d 364 (1982); *see also Shipman* v. *State*, 252 Ark. 285, 478 S.W.2d 421 (1972).

Glaring discrepancies existed between the State's evidence and the appellant's version of the shooting. Based on those crucial differences, we believe the jury permissibly could, as it did, infer the homicidal nature of Jones' mental state at the time of the shooting. Viewing the evidence in the light most favorable to the appellee, we conclude the State, through expert testimony and circumstantial proof, contradicted appellant's story of what happened on the night of Ms. Terry's death. The State presented evidence to show that the appellant simply could not have been standing beside Ms. Terry, showing her how to load the rifle and that she did not grab the rifle, thus causing it to accidentally discharge. Instead, the evidence is sufficient to allow the jury to reasonably infer that the appellant, a knowledgeable gun handler, loaded the 30-30 Marlin rifle inside the house; he advanced toward Ms. Terry, and shoved the rifle's muzzle into her abdomen, from which she retreated to, or close to, the south wall in the living room. While Ms. Terry cowered and attempted to push the rifle away, appellant pulled the trigger. He then walked to the opposite end of the couch and returned the rifle to the gun rack before administering aid to Ms. Terry or calling friends for help.

Appellant does not deny he shot Ms. Terry; instead, he argues that he simply did not intend to shoot her.

Accordingly, appellant contends the State did not bring forward any motive which would suggest to the jury that he premeditated and deliberated the murder. To the contrary, appellant points out that the evidence shows he and Ms. Terry had a loving relationship and that he tried to get her to the hospital as quickly as possible after she was shot. The short answer to appellant's contention is that the State is not bound to prove a motive for the killing, and the absence thereof is only a circumstance to be considered with other facts and circumstances in determining guilt or innocence. *Ezell* v. *State*, 217 Ark. 94, 229 S.W.2d 32 (1950); *Dowell* v. *State*, 191 Ark. 311, 86 S.W.2d 23 (1935). *See also Murry* v. *State*, 276 Ark. 372, 635 S.W.2d 237 (1982). Perhaps appellant did not premeditate the murder for long, but an instant of premeditation is long enough. *Shipman, supra; Green* v. *State*, 51 Ark. 189, 10 S.W. 266 (1888).

In addition to the lack of motive, the appellant contends the State's evidence, which is circumstantial evidence consisting of experts' testimonies, does not exclude an accidental shooting as a reasonable hypothesis to be drawn from the evidence taken as a whole. For circumstantial evidence to be sufficient, it must exclude every reasonable hypothesis consistent with innocence. *Drew* v. *State,,* 8 Ark. App. 120, 648 S.W.2d 836 (1983). However, it is basically a question for the jury to determine whether the evidence excludes every other reasonable hypothesis. *Upton* v. *State,* 257 Ark. 424, 516 S.W.2d 904 (1974).

Appellant does not attack the qualifications of the experts or in any way impeach the witnesses themselves on appeal. He simply presents to this Court the testimonies of the State's experts in his abstract and calls them "illogical" and "contradictory." Of course, this part of appellant's argument goes to the credibility and weight of the expert witnesses, and he presumably made such a plea to the jury at trial. Nonetheless, it is not our duty or function to assess credibility. Testimony of expert witnesses is to be considered by the jury in the same manner as other testimony and in the light of other testimony and circumstances in the case; the jury alone determines its value and weight, and may, under the same rules governing other evidence, reject or accept all

or any part thereof as it may believe to be true or false. *Gruzen* v. *State*, 267 Ark. 380, 591 S.W.2d 342 (1979), *cert. denied,* 449 U.S. 852 (1980), *appeal after remand,* 276 Ark. 149, 634 S.W.2d 92 (1982), *cert. denied,* 103 S.Ct. 386 (1982). *See also Parris* v. *State,* 270 Ark. 269, 604 S.W.2d 582 (Ark. App. 1980). The trial court instructed the jury on all degrees of homicide, and it was the jury's agonizing duty to resolve the conflicting theories and evidence presented by the State and the appellant. Based on our careful review of the record, we are compelled to conclude that the State offered substantial evidence from which the jury could find the appellant guilty of the premediated and deliberate murder of Annie Terry.

Appellant also contends the State conducted an illegal search of his home, and the trial court erred in not suppressing the evidence against him obtained in this search. The trial court found appellant had consented to this search and that the search was also valid because it was incidental to a lawful arrest.

We agree with appellant that the search was not incidental to a lawful arrest. Appellant was arrested at 1:00 A.M. in Fort Smith. His home, in Paris, was not searched until 5:00 A.M. The search incident doctrine has two purposes: (1) to enable police officers to protect themselves by searching suspects for weapons, and (2) prevent the destruction of evidence. *Chimel* v. *California,* 395 U.S. 752 (1969). *See also* J. Hall, *Search and Seizure* § 8:7 (1982). Because of the remoteness in time and place of the site of the search from the arrest site, there was no danger appellant could produce a weapon or destroy evidence. There were no exigencies at appellant's arrest that would justify a search incident to a lawful arrest. *Cf. Chimel, supra; Van Cleef* v. *New Jersey,* 395 U.S. 814 (1969); *Shipley* v. *California,* 395 U.S. 818 (1969); *Preston* v. *United States,* 376 U.S. 364 (1964); *Jenkins* v. *State,* 253 Ark. 249, 485 S.W.2d 541 (1972).

Even though the State's search of appellant's home was not a search incident to a lawful arrest, we agree with the trial court that appellant consented to the search. Of course, appellant argues he never consented to a police search of his

home. However, the two police officers who questioned him in Ozark say he invited them to examine the crime scene. The State has the burden of proving by clear and positive testimony that consent to a search was freely and voluntarily given. *Scroggins* v. *State*, 268 Ark. 261, 595 S.W.2d 219 (1980).

Appellant does not argue he was directly or indirectly coerced by the police officers into consenting. Nor does the appellant contend he acquiesced to a seemingly valid claim of lawful authority to search his home, which subsequently turned out to be invalid. Appellant simply argues that the State did not prove by clear and positive testimony that his consent to the search was freely and voluntarily given. To show the State's lack of clear and positive testimony regarding his consent to the search, appellant cites four facts: (1) his drunkenness; (2) the failure of the State in its answer to his motion for discovery to mention his verbal consent; (3) the belief of the police officers that they did not need a warrant to search a violent crime scene; and (4) the failure of the police to obtain from appellant a written consent to the search when such a written consent could easily have been obtained.

Appellant cites *White* v. *State*, 261 Ark. 23-D, 545 S.W.2d 641 (1977), and argues that the intoxication of the accused removes clarity and positiveness from the police officers' testimony that the accused consented to the search. *White* is distinguishable, however. The accused in *White* was so drunk that he remembered almost nothing of his encounter with police officers in his home and was intoxicated enough to be placed by the police in a drunk tank after the search of his home was completed. Appellant was not so intoxicated. By his own testimony, appellant had drunk his last beer at approximately 8:30 P.M. Seven hours later, at approximately 3:30 A.M., police officers say he consented to the search. By this time, given what had transpired in the interim, appellant was soberer that the accused in *White*. There was also testimony in *White* by the accused that the police officers had shoved a pistol in his face. This evidence of coercion was considered by the court in holding:

When we consider all the circumstances in connection with the alleged consent here we are unable to say the State met its burden of proving consent freely and voluntarily given by clear and positive testimony.

*Id.* at 25, 545 S.W.2d at 643. There was no testimony of similar coercive tactics being used against appellant in this case.

The other three factors cited by appellant amount to a claim that the police never asked him if they could search his home and lied when they testified that he did consent. This argument notwithstanding, we agree with the trial court that given "all the circumstances in connection with the alleged consent," the two police officers' testimonies that appellant did consent is clear and positive testimony that appellant did so consent. It is for the trial court to determine the credibility of the witnesses, and it is not required to give the appellant's testimony greater weight than that of the police officers. *Johnson* v. *State*, 6 Ark. App. 342, 642 S.W.2d 324 (1982).

We affirm the appellant's conviction for murder in the first degree.

Affirmed.

CLONINGER and CORBIN, JJ., dissent.

LAWSON CLONINGER, Judge, dissenting. I respectfully dissent from the majority opinion in this case. Ark. Stat. Ann. § 41-1502 (Repl. 1977) reads in pertinent part:

A person commits murder in the first degree if: . . . with the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person.

No killing can be murder in the first degree in the absence of premeditation and deliberation. Where there is no testimony indicating any deliberate or premeditated intention to kill and no evidence showing that the defendant harbored any

malice or ill will toward the victim, a jury verdict of murder in the first degree is difficult to sustain. *Stanley* v. *State*, 183 Ark. 1093, 40 S.W.2d 415 (1931). See also *Blake* v. *State*, 186 Ark. 77, 52 S.W.2d 644 (1932).

In *Simmons* v. *State*, 227 Ark. 1109, 305 S.W.2d 119 (1957) the court held that the state must prove, beyond a reasonable doubt, that a killing was done willfully, deliberately, maliciously and with premeditation of mind in order to sustain a conviction of first degree murder. The court held that, generally speaking, when the fact of death alone is proved, the presumption is that the crime is murder in the second degree; and, before it can be determined that crime is murder in the first degree, it is incumbent on the prosecution to prove further, by evidence, that the killing was done with premeditation and deliberation. Premeditation cannot be inferred from the fact of death, but there must be evidence of a prior intention to do the act of killing in question. Accordingly, the court reduced the conviction of Simmons to murder in the second degree.

From a review of the record in this case, I can find no evidence which the state introduced on the issue of premeditation and deliberation. The evidence against appellant was circumstantial. In an attempt to discredit appellant's statement and to prove that the act was an intentional killing, the state relied on expert testimony regarding the nature and character of the wounds, the location of the victim when she was shot, and the significance of the metal tracings on the victim's hands and body. I agree with the majority that the jury has the duty to determine the value and weight to be given to expert testimony, and that there was substantial evidence to support a jury verdict that appellant did intentionally kill the victim. But I cannot find one shred of evidence to support a finding of first degree murder. The majority states, "Perhaps appellant did not premeditate the murder for long, but an instant of premeditation is long enough." I agree. However, there is not any evidence to support a finding that appellant harbored even an instant of premeditation.

Therefore, I would reduce the conviction of appellant to murder in the second degree.

CORBIN, J., joins in this dissent.